# DRURY R. BASKERVILLE *v.* STATE OF MARYLAND

[No. 102, September Term, 1974.]

*Decided November 19, 1974.*

The cause was argued before THOMPSON, MOYLAN and DAVIDSON, JJ.

*Elsbeth L. Bothe* and *George E. Burns, Jr., Assistant Public Defenders,* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with

whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City* and *Sandra O'Connor, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

As in a "shell game" at a country carnival, a "check kiting" scheme has the elements of the crime of false pretenses moving back and forth from one transaction to the next so rapidly under the hands of a skilled manipulator that the ultimate resting place of a particular element is exceedingly difficult to locate.

*Webster's Third New International Dictionary* (Unabridged) gives the following definition of the verb "kite":

> "To get money or credit by a kite: *specif.* to create a false bank balance by manipulating deposited accounts."

51 *Corpus Juris Secundum,* at 532, defines "kiting" as:

> "Originally a business term meaning the lending of credit by one commercial firm to another, but it is more commonly employed to denote a species of fraud or fraudulent practice consisting in the exchange of drafts or checks of approximately the same dates and amounts."

An example may serve better than a formal definition. Assume that a defendant, or his confederate, has an account at Bank A with only a nominal balance. On Monday, a check is written to the defendant in the amount of $100. The defendant immediately walks to Bank B, where he has an account and is known as a reliable customer, and cashes the check for $100. The check now in the hands of Bank B does not, of course, clear on that particular day and the defendant has created for himself $100 out of nothing. To keep the scheme afloat, a second check is drawn on Bank A on Tuesday. It then is cashed at Bank B and the cash is, in turn,

redeposited at Bank A. The deposit covers the check written on Monday, which is just now clearing. Tuesday's check has not yet been covered. The scheme is repeated on Wednesday, Thursday and Friday. At the end of the week, five $100 checks, totaling $500, have been written on Bank A. The five checks have been cashed at Bank B for $500. Four hundred dollars has been redeposited at Bank A to keep the scheme afloat. The remaining $100 is the profit of the "kiting" operation.

| | BANK A | | BANK B | |
|---|---|---|---|---|
| | Checks Drawn | Deposits Made | Checks Cashed | "Kiter's" Profit |
| Monday | $100 | | $100 | $100 |
| Tuesday | $100 | $100 | $100 | |
| Wednesday | $100 | $100 | $100 | |
| Thursday | $100 | $100 | $100 | |
| Friday | $100 | $100 | $100 | |
| | $500 | $400 | $500 | $100 |

Like a juggler with three balls aloft but only two hands, the "kiting" operation, once begun, cannot stop, lest the uncovered ball "bounce." Theoretically, the operation could go on indefinitely. In fact, the music always stops for one reason or another: Bank A spots the telltale signs of "kiting" and cancels the account upon which the checks are drawn; Bank B becomes suspicious and withdraws credit, refusing to cash any checks until they are cleared; the "kiter" is hit by a truck or leaves for Brazil. In our simplified model, the "music stops" on Friday. Bank B has already cashed its fifth $100 check. It will learn on Monday or Tuesday that Bank A has returned the check marked "insufficient funds." Bank B will then be the victim of a false pretense as to that $100.

The crime of False Pretenses is simply stated in Art. 27, § 140:

"Any person who shall by any false pretense

> obtain from any other person any chattel, money or valuable security, with intent to defraud any person of the same, shall be guilty of a misdemeanor . . . ."

As Chief Judge Orth pointed out for this Court in *Polisher v. State,* 11 Md. App. 555, 560, 276 A. 2d 102:

> "The false pretense is the crux of the crime. So the crime is committed when a person:
>
> 1) by making a false representation of a past or existing fact;
>
> 2) with intent to defraud; and
>
> 3) knowledge of its falsity;
>
> 4) obtains any chattel, money or valuable security from another;
>
> 5) who relies on the false representation;
>
> 6) to his detriment."

See also *Smith v. State,* 237 Md. 573, 207 A. 2d 493; *Tumminello v. State,* 10 Md. App. 612, 272 A. 2d 77; *Lockhard v. State,* 3 Md. App. 580, 240 A. 2d 312.

In the example given, five false representations are in fact made by the "kiter" to Bank B, one on each day of the week. The false representation is as to an existing fact, to wit, that "there are funds in the account at the drawee bank to cover the check being presented for cashing" (Element 1). In each case, the "kiter" knows of the falsity of his representation (Element 3). In each case, Bank B relies upon the false representation (Element 5) and thereby parts with $100 (Element 4). These elements of the crime of false pretenses classically present no problem when applied to a "kiting" operation.

The sixth element — detriment to the victim — is more troublesome. In the example given, it is clear that Bank B relied upon Friday's false representation to its ultimate detriment — the loss of the $100 (which had been paid out in cash) when the check relied upon was returned marked "insufficient funds." The defendant-"kiter" typically makes

the claim — on its surface deceptively attractive — that there was no ultimate detriment on the other four days and, therefore, no crime of false pretenses. His theory is that there was neither financial loss nor mental anguish to Bank B since money was on deposit at Bank A in time for the first four checks to clear. He reasons that Tuesday's successful false representation erases the detrimental effect of Monday's false representation, and so on through the weeks and months *ad infinitum*. The law, however, recognizes "detriment" of a more subtle variety. On each of the days in question, Bank B, by relying upon the false representation, exposed itself to a hazard which it would not have assumed but for that reliance. On each day, it ran the risk that the "kiter's" scheme would go awry. That, according to the common law of false pretenses, is detriment enough. In 32 Am.Jur.2d, False Pretenses, § 38 "Injury or prejudice resulting from transfer," it is said, at p. 200:

"[T]he gravamen of the offense is in the making of the false pretense with intent to defraud and thereby obtaining another's property. So it is not essential that the victim suffer a permanent loss or that he sustain a pecuniary loss. The offense is complete when money or property has been obtained by false representations, and it cannot be purged by subsequent restoration or repayment. Accordingly, where a person induces another, by means of false pretenses, to part with his property, he cannot defend against a charge of obtaining property by false pretenses by showing that the person who parted with his property had recovered in a civil action the value of the property, or by showing that the victim had recovered by other means or from other sources. Nor will the actual repayment of a loan obtained by false pretenses constitute a defense against a criminal prosecution for obtaining money by false pretenses."

See *People v. Jones*, 36 Cal. 2d 373, 224 P. 2d 353; *State v.*

*Mills,* 96 Ariz. 377, 396 P. 2d 5; *Pepper v. People,* 75 Colo. 348, 225 P. 846.

Of similar import is Perkins, *Criminal Law* (2d Edition, 1969), at 313-314:

> "[T]here is no requirement of actual pecuniary loss on the part of the intended victim. If the false representation was with reference to the security given for money borrowed, or property purchased on credit, it is no defense to a charge of false pretenses that the debt has since been paid."

Equally troublesome, at first glance, is the second element — the "intent to defraud." Two problems here raise their heads. A defendant-"kiter" will typically claim that, although he may have derived $100 in unearned profit from Monday's false representation, he derived no profit whatsoever from the four succeeding false representations. The $100 in each instance, according to his claim, went for the benevolent purpose of reimbursing his victim (via making a deposit in the drawee bank) for an earlier false representation. That sort of reasoning is specious in two regards. Initially, he does derive a benefit from each of the later false representations. He gets the benefit of Friday's $100 both when he satisfies Thursday's debt with that $100 and when he, thereby, covers the tracks of Thursday's criminality. It is, furthermore, no requirement of the law of false pretenses that the money received from another be applied to the taker's benefit. Chief Judge Orth made that very clear in *Polisher v. State, supra,* at 11 Md. App. 580-581:

> "The argument fails because '[t]here is no doctrine of *lucri causa* in the field of false pretenses. It is accordingly immaterial that the defendant did not gain or intend to gain any personal benefit or advantage from obtaining the property from the victim.' *Id.* [2 Wharton's *Criminal Law* (Anderson Edition)] § 583, p. 309. '[T]he defendant is responsible for his false pretense even though he did not personally gain any bene-

fit from the goods which had been obtained there-
by.' *Id.*, § 585, p. 316. It is stated in Hochheimer,
*Criminal Law* (2nd Ed. 1904), § 323, p. 356: 'It is
sufficient that the thing has been confided to
the offender, it being immaterial that he
did not obtain it on his own account, nor for his
own gain or benefit.' "

The defendant-"kiter" typically attempts to gainsay the
"intent to defraud" in a second fashion. He claims (as does
the appellant here) that the entire "kiting" scheme was
simply a means by which he managed to "borrow" the
money. He utterly disavows any intent to steal, that is, to
keep the money permanently. He claims self-righteously
that he is an honorable man and that he fully intends to pay
back every cent, once his fortunes are in better repair.
Despite its surface charm, the defense is unavailing.
Instructive in this regard is Clark and Marshall's *Law of
Crimes* (Wingersky Edition, 1958), at 823:

"If a person, however, obtains money or goods by
false pretenses, he is none the less guilty because he
intends to repay the money or pay for the goods, for
'an intent to defraud is consistent with an intent to
undo the effect of the fraud if the offender should
be able to do so.' That there is ability as well as
intent to repay is no defense. Even an offer to repay
or actual repayment is no defense."

See *Commonwealth v. Schwartz,* 92 Ky. 510, 18 S. W. 775;
*People v. Oscar,* 105 Mich. 704, 63 N. W. 971.

The same point is made in 32 Am.Jur.2d *False Pretenses,*
§ 33, "Intent to defraud," at p. 197:

"If the accused had the requisite intent, he may
be guilty of the crime of obtaining money or
property by false pretenses even though he may
have intended to repay the money or restore the
property."

See also Perkins, *Criminal Law* (2d Edition, 1969), at 312-313:

"It is now necessary to emphasize that an intent to repay will not necessarily prevent guilt of this crime. . . .

One who is asked to lend money or to sell goods on credit has a right to determine for himself whether he chooses to be a secured creditor or an unsecured creditor, and if he chooses to be the former he has a right to know about the security. One who has extended credit in reliance upon a mortgage on real estate which is falsely represented to be a first mortgage when in fact it is subject to a prior recorded mortgage for more than the land is worth, or is a mortgage upon property which the mortgagor does not own, has been defrauded even if the debtor has an intent to pay the debt. The lender intended to be a secured creditor but by reason of the false representation his position is for all practical purposes that of an unsecured creditor. There is an obvious and unreasonable *risk* of loss which has been forced upon him, without his knowledge or consent, by reason of the deceit. This risk which the creditor did not intend to assume was imposed upon him by the *intentional* act of the debtor, and this amounts to an intent to defraud."

. . . If by reason of the false representation of the debtor, the creditor has assumed a substantially greater risk then would have been his if the debtor's statements had been true, this requirement of the crime is satisfied even if the security is not entirely worthless, or even if it may turn out to be adequate."

In the face of this law, the typical defendant-"kiter's" claim that his demonstrated pattern of regular repayments evidences his good faith and belies any "intent to defraud" becomes irrelevant. Also irrelevant becomes the claim that

he would have "made good" upon the last false representation, if some unforeseen circumstance beyond his control — the closing of an account by one bank or the withdrawal of credit by the other — had not frustrated his efforts to do so. The pattern, indeed, rather than demonstrating good faith is laid bare for what it is: the frantic necessity for the "kiter" to run faster and faster and "kite" larger and larger sums in a desperate effort to keep his artificial financial empire from collapsing and to derive, in the process, some continuing proceeds therefrom. The claim that "some day it will all be made good" is legally meaningless. As well might an embezzler claim that he had "no intent to defraud" the victimized bank, on the theory that the embezzler was only "borrowing" the money and had every honorable intention of returning it just as soon as his ship came in or his horse finished in the money.

### The Facts in this Case

Upon this legal framework, the guilt of the appellant, elusive enough while still in the briar patch of tangled and undifferentiated facts, becomes all too clear. The appellant, Drury R. Baskerville, was a 53-year-old teacher in the public schools of Baltimore. He was convicted by Judge Shirley B. Jones, sitting without a jury, in the Criminal Court of Baltimore, upon three indictments, each charging false pretenses generally (as well as a violation of Section 142, the "bad check statute" specifically).

Although the appellant's house of cards did not crash down until the end of July, 1971, its cornerstone was laid at least as early as a year before. Delores Brenda Miller, a girlfriend of five years' standing, and Robert Allen Gantt, a substitute teacher at the appellant's school, were either willing pawns or intellectually inert putty in the hands of the appellant.

Mrs. Miller had a personal checking account at the Maryland National Bank in which she normally kept a small balance in order to pay her household expenses. Mrs. Miller testified that "maybe a year, year and a half" before July,

1971, she began writing checks on this account to the appellant and in excess of the balance maintained by her in the account. She continued to use the account for her own personal purposes and would make deposits to cover such amounts. She relied exclusively on the appellant, however, to make appropriate deposits to cover the checks made payable to him. Incredibly, Mrs. Miller wrote the checks to the appellant because "He asked me to":

"Q. And would you tell the Court how you came about to write some checks for Mr. Baskerville?

A. He asked me to.

Q. All right. And would you tell us the circumstances under which he would ask you to write the checks? What would he tell you when you were writing the checks as to amount and number and everything of that sort?

A. When he first asked me to write the checks for him there was no specific amount that he would ask for, but gradually as the check amounts increased I was asked to give certain amounts, put certain amounts on the checks.

Q. All right. And did you have any idea what this was for at that time when you were writing it?

A. Not really, no. Not really, no."

Mrs. Miller was either remarkably ingenuous or cunningly disingenuous:

"Q. Mrs. Miller, did there come a time when you ever had a discussion with Mr. Baskerville about why he was having you write these checks?

A. Several times I attempted to discuss it with him, but I couldn't quite understand.

Q. Would you explain to the Court what it was Mr. Baskerville told you?

A. I have no idea.

. . . .

Q. Did Mr. Baskerville attempt to explain to you just why and what he was doing?

A. I think he did, yeah.

Q. So that your testimony that you didn't know what was going on is simply because you were unable to understand it?

A. That's right."

At times, multiple checks would be written at a single writing:

"Q. And at the times he was there do you recall whether or not you would be writing one check or more than one check or on what type of basis it was?

A. When it began it was maybe one or two, but I couldn't tell you exactly how many I would write at a time."

According to the records of the Maryland National Bank, over $71,000 passed through Mrs. Miller's account between April 1, 1971, and August 1, 1971.

In May of 1971, Robert Allen Gantt opened a checking account at Maryland National because the appellant, a fellow teacher, asked him to:

"Q. All right. And why did you open the account at Maryland National?

A. Well, because like — well, at first Mr. Baskerville, you know, had asked me, you know, about opening up a checking account, so, you know, I went on and said okay. And then the first twenty dollars was deposited by him."

The appellant furnished Gantt with the $20 with which the account was opened. During the ensuing four months, Gantt wrote a number of checks to the appellant and relied upon the appellant exclusively to make all of the deposits into the account. Gantt himself never made a single deposit. The checks made out to the appellant ranged in amount "from

about three hundred up to about maybe eight or nine hundred." When asked how often he wrote such checks, Gantt replied, "If I think correctly, I think it was maybe about two checks a day, you know, over a period of time." The explanation as to why he participated in such an exotic banking practice was, from the mouth of a college-trained school teacher, incredible:

> "A. Well, Mr. Baskerville, you know, had asked me, you know, about writing checks for him. At first I was skeptical about it, but then, you know, I figured by him, you know, being nice enough to just open the account for me, you know, well, you know, the best thing for me to do, you know, was to show him, you know, my appreciation and not thinking, you know, there was anything wrong about it, you know, like knowing, you know, that the checks, you know, know, were coming back and being paid also, I didn't have any — you know, I didn't even bother about questioning him about it because I thought it was perfectly all right."

The records of the Maryland National Bank revealed that approximately $31,000 passed through Gantt's account during the months of May, June and July, 1971. Between the two accounts, the cash flow for the several-month period was in the neighborhood of $102,000.

When the appellant took the stand in his own defense (his credibility as a witness, if not as a public school teacher, was eroded by his acknowledgment that he had been convicted in Denver in 1953 of conspiracy, forgery and uttering and had served three years in Leavenworth), he revealed that Mrs. Miller's and Gantt's were not the only bank accounts he had operating:

> "Q. . . . [F]irst of all, was Miss Miller's and Mr. Gantt's the only bank accounts you were running in this operation?
> A. No.

Q. There were others, weren't there? How many others were there?

A. Oh, periodically, I guess, three, four, maybe five other people at times."

Richard T. Davis, a bank security officer at Maryland National, testified that he was alerted on June 9, 1971, to the fact that the appellant, "who was related to many accounts at the Maryland National Bank, was making large unusual cash transactions." Shortly thereafter, Mr. Davis viewed the appellant "on many occasions making deposits to various accounts within Maryland National Bank," all but one of which "were those of other persons" including Gantt and Mrs. Miller.

Maryland National closed the accounts of Gantt and Mrs. Miller on August 2, 1971, because, according to Mr. Davis:

"A. Between the dates of June 9th, 1971 and August the 2nd of 1971 I personally had been watching these accounts very closely as they had the indications of a kiting operation and I was, therefore, keeping close touch with our bookkeeping department to find out at what point during this kiting operation that Maryland National Bank would be on the black side of the credit line, so to speak, so we would not be injured by any loss. So, as soon as we were on this black side of this line then I cut off the accounts, and that was on August 2nd."

Mr. Davis explained how this "kiting" operation varied from the more garden variety and was, therefore, more difficult to pin down with reasonable certainty:

"A. The term kiting operation refers to a manipulation of accounts, usually one established or two or more accounts established in different banks. The accounts are usually opened up with a small amount of money at first and they are

conducted in a very proper manner for an indefinite period of time or until the customer becomes known to tellers in various offices and obtains a reputation as being a good customer. Even though he may not be known by name, they see him on a daily basis and get to know his presence in the bank. And then after he gains the confidence of the tellers in various banks he will go to one bank with a check, let's say in this case — well, let's use a different case being it's hypothetical. . . .

A. Mr. Smith opens an account in 'A' bank. And then he opens an account also in 'B' bank. Well, he would draw a check on 'A' bank in the sum of a thousand dollars and deposit it in 'B' bank and he would be known to the tellers in 'B' bank and would be given immediate credit, cash credit for that check. Then he would have the use of that money for a twenty-four hour period or until such time that he deposits a check drawn on 'B' bank into 'A' bank in a similar amount. So, therefore, there is very rarely in the average kiting operation any actual cash money being transacted. And in this particular instance, and the reason it took so long for us to determine just exactly what was going on, this was a very unique operation, whereas, the deposits being made into the accounts of Mr. Gantt and Miss Miller at Maryland National Bank were being done so in cash, however, the checks that were being drawn against these accounts were being taken to Equitable where they were being cashed and the person given cash and then right away he would run the two-block period which came from Equitable Trust to our bank and deposited the cash money back. So, he had a continuous cash flow going through his account and, as I say, very unique. It was a very sophisticated kiting operation and one that has become quite a rarity in banking circles too, I might add. Did I describe adequately —

MRS. O'CONNOR: Yes.

MRS. BOTHE: Not by my standards . . ."

The ax fell on July 27, 1971. On the preceding day, July 26, the appellant cashed three checks at the Equitable Trust Company. All three were drawn on the Maryland National Bank. Delores Miller had made out one of the checks to the appellant in the amount of $998. The check was dated July 22, 1971. Robert A. Gantt had made out a second check to the appellant in the amount of $996. It was dated July 20, 1971. Gantt had also made out another check, dated July 17, 1971, to the appellant in the amount of $978. When the checks were cashed on July 26, there were not sufficient funds in either the Miller or the Gantt account to cover the respective checks. Following his regular modus operandi, the appellant appeared again at the Equitable Trust Company on July 27 to cash additional checks. The cash he anticipated receiving would then have been deposited by him in the Miller and Gantt accounts at the Maryland National Bank to cover the three checks that had been cashed the day before and which had not yet cleared. For some reason not fully explained in the record, the Equitable Trust Company refused to extend further credit, for check cashing purposes, to the appellant on July 27. As the appellant explained it:

"Q. Now, how often would you have to make deposits and cash checks in order to keep this going with the Gantt and Miller accounts?

A. Well, as I explained earlier, this would have to be done daily because if you cash the check today you would have to make the deposit in that account the next day.

Q. So, I take it that every single day you had to cash a check?

A. Yes.

Q. And every single day you had to make a deposit?

A. Yes, that's right.

Q. Now, what happened that all this came to a halt with three checks that could not be —

. . .

A. This was around about the latter part of July 1971. And she told me that they had said they didn't want to cash any more checks, you know, not to cash — they just wanted to call a halt to cashing any checks that I would bring in from that time, you know, on.

Q. And as a result did they then refuse to cash some checks for you?

A. That day, yes. Yes.

Q. Now, as a result of their having refused to cash the checks for you what happened with the Gantt and Miller accounts?

A. Well, I was unable to make the deposits in their accounts, you know, as explained."

As a result of the failure of the false representation on July 27, the "worthless checks" cashed on July 26 could not be covered. With respect to all three checks, Equitable had them returned by Maryland National marked "not sufficient funds." Only then did Equitable realize that it had been "taken" to the tune of $2,972.

The three indictments on which the appellant was convicted relate to the passing of these three checks, respectively. The first count of each indictment charges false pretenses generally under § 140. The second count of each indictment charges a violation of § 142, the bad check statute.

The appellant's basic contention is that the evidence was not legally sufficient to sustain his convictions. We have no difficulty in holding quite otherwise. In a case tried before the court without a jury, the test as to whether the trial judge was clearly erroneous in reaching a verdict of guilty on the evidence is whether the admissible evidence adduced at the trial either showed directly, or circumstantially, or supported a rational inference of, the facts to be proved, from which she, as the trier of the fact, could fairly be convinced, beyond a reasonable doubt, of the appellant's guilt of the offenses charged, and due regard will be given to the opportunity of the lower court to judge the credibility of

the witnesses. *Williams v. State,* 5 Md. App. 450, 459, 247 A. 2d 731; *Metz v. State,* 9 Md. App. 15, 23, 262 A. 2d 331; Maryland Rule 1086.

With respect to each check, the appellant falsely represented to Equitable Trust that there was a sufficient balance in the accounts at Maryland National to cover such check. These misrepresentations were knowingly made by the appellant. Equitable Trust relied upon the representations and parted with $2,972 to its ultimate detriment. For reasons hereinbefore discussed, the appellant's self-serving declarations that he fully intended to "pay the money back" and that he was "only borrowing it" do not negate the last and critical element of "intent to defraud" on his part. *Clark and Marshall, supra,* 823; 32 Am.Jur.2d, *False Pretenses,* § 33, "Intent to defraud," p. 197; *Perkins, supra,* 312-313.

The appellant's "non culpa mea" is, moreover, as factually bizarre as it is legally untenable. The particular "ship" which the appellant claimed to be expecting "to come in" was an anticipated promotion within the school system. The appellant was due to receive his bachelor's degree from Coppin State College in June, 1971. Once certified as a degree holder, the appellant would be paid for the next school year at the rate of approximately $10,000 per year. As a mere "provisional" teacher without a degree, he was paid $6,100 per year. As he described his anticipated rise in station, "[P]rior to that I had been a provisional teacher which, well, it's quite a difference between that and a tenure teacher with alleged qualifications." Having outstanding bills and anticipating a substantial raise, he acknowledged that he may have "jumped the gun in some respects." The appellant did not seem to understand or was not willing to acknowledge that he would only begin to earn salary at the $10,000-a-year rate in September, 1971, that he would receive some part of his $4,000 raise with each ensuing paycheck over the course of the year, and that various deductions and taxes would be withheld. He insisted that he expected to receive a "lump sum" of $4,000 in September with which he would close down the "kiting" operation so

that no one would be harmed. He never did successfully explain how he expected his anticipated salary increase to be paid a year in advance in a lump sum with no deductions. Judge Jones, as fact finder, did not share his uncritical optimism.

With respect to the appellant's second contention that he should not have been convicted for violations of both § 140 and § 142, he wins at least a moral victory (the sentences were concurrent).

*Flannigan v. State,* 232 Md. 13, 191 A. 2d 591, made it very clear that where the false pretense is the passing of a worthless check, it is not proper to convict a defendant under both § 140 and § 142 for a single transaction:

> "Applying that test to the instant case, it is readily observed that a conviction under § 142 requires 'proof of a fact' (a worthless check) that § 140 does not necessarily require. However, a conviction under § 140, when a bad check is involved, does not require 'proof of a fact' that is not essential to sustain a conviction under § 142. Hence, we hold that appellant should not have been convicted on the fourth count. A holding to the contrary would mean that, when a worthless check is involved, a defendant could be subjected to a double sentence by the simple expedient of finding him guilty under both sections, even though but a single check was involved."

Cf. *Sutton v. State,* 2 Md. App. 639, 236 A. 2d 301.

> *Judgments as to the first count of indictments 2270, 2271 and 2273 charging false pretenses affirmed; judgments as to the second count of each indictment charging a violation of § 142 reversed.*