664 A.2d 116

**COMMONWEALTH of Pennsylvania**

v.

**Barry GRIFE, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 23, 1995.

Filed Aug. 14, 1995.

364

John W. Packel, Assistant Public Defender, Philadelphia, for appellant.

Kathy L. Echternach, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before OLSZEWSKI, JOHNSON and BROSKY, JJ.

OLSZEWSKI, Judge:

Following a bench trial, Barry Grife was convicted of one count of attempted theft by deception,[1] and three counts of theft by deception.[2] Post-verdict motions were denied, and Grife was sentenced to three concurrent five-year terms of probation and ordered to pay restitution in the amount of $9,100 to the complainant, the Honorable Alan Silberstein.

Grife, a real estate broker, appraiser, and title insurance agent in the Philadelphia area, borrowed $10,000 from Shoppers Publication, Inc. (Shoppers). This loan was to be secured by a mortgage of $11,800 granted to Shoppers on Grife's home at 43 Merrydell Drive, Northampton, Bucks County. Previously, Grife had executed a $20,000 mortgage on the same home to his mother, Bessie Grife (mother).

Shoppers recorded its mortgage September 19, 1986. At the time of the first loan, Grife presented Shoppers with a satisfaction of the mortgage to mother. Between August of 1986 and January of 1987, Shoppers loaned Grife additional moneys. In exchange, Grife executed a second mortgage, for $35,000, to Shoppers on his Northampton home. During this period of time, Grife continued to make payments on the first Shoppers loan.

In October of 1986, after the first Shoppers mortgage was recorded but before the second was executed, Grife took another mortgage out on the same Northampton residence, this time with Northwood Federal Credit Union (Northwood). Grife borrowed $100,000 from Northwood. In 1984, Grife had

1. 18 Pa.C.S.A. § 901(a).
2. 18 Pa.C.S.A. § 3922(a).

granted Northwood a $35,000 mortgage on the home, which was satisfied from the proceeds of the second Northwood loan.

Northwood allowed Grife to conduct the title search as title agent to his own loan. Grife was part owner of a title insurance business, the Delaware Valley Abstract Company. Grife had represented to the board at Northwood that he would save transactional costs by doing his own title search. N.T. 7/12/93 vol. 1 at 61. While he agreed to subordinate mother's mortgage to Northwood's interest, Grife failed to report Shoppers' $11,800 lien. *Id.* at 63–64. Northwood was thus unaware that it was second in line behind the Shoppers mortgage.

Three months after executing the Northwood mortgage, Grife negotiated the second mortgage with Shoppers. Two months after that, on March 12, 1987, Grife took out yet another mortgage, this time with First Financial Corporation (Financial), for the sum of $56,277. Once again, and allegedly for the same reasons as before, Grife acted as his own title agent. N.T. 7/12/93 vol. 2 at 24. An affidavit was prepared for Financial's benefit stating that the Northampton home was free and clear of all loans, taxes, liens, mortgages and judgments, except for the $100,000 mortgage to Northwood. *Id.* at 25–26. A title commitment showed mother's and Shoppers' mortgages as removed. *Id.* at 28–30. The result was that Financial believed its mortgage interest in the property was second only to Northwood's. *Id.* at 30.[3]

Six days later, on March 18th, Grife paid off the $35,000 and the $11,800 loans from Shoppers. He received from Shoppers the satisfaction pieces for both the second mortgage and the mortgage to mother. *Id.* at 30, 33. Because Grife was planning to borrow more money from Shoppers, no satisfaction piece was sent for the first $11,800 Shoppers mortgage. Instead, Grife used this mortgage to secure an additional $5,000 loan from Shoppers. *Id.* at 28.

---

3. Financial sold its mortgage to Security Pacific within a month after settlement. N.T. 7/12/93 vol. 2 at 42.

At this point, therefore, Grife had an $11,800 mortgage to Shoppers, a $100,000 mortgage to Northwood, a subordinated $20,000 mortgage to mother with a satisfaction piece that was never entered, and a $56,277 Financial mortgage. As if this were not enough, Grife solicited his business partner in the title insurance agency, attorney Ronald Bayer, for more money.

Bayer, in turn, spoke to his former law partner, the Honorable Alan Silberstein, President Judge of the Philadelphia Municipal Court, about lending Grife $10,000. Judge Silberstein lent Grife the money at 12% simple interest, interest to be paid in twelve equal monthly installments, principal to be paid in full one year from the date of the loan. In exchange, Grife gave Judge Silberstein a $10,000 mortgage on the house. N.T. 7/13/93 at 85.

Based upon letters and documents supplied to Judge Silberstein by Grife, the judge believed that his mortgage was in third place, behind the Northwood and Financial mortgages in priority. *Id.* When Grife sent Bayer the results of a title search, marginal notations listed the $11,800 Shoppers mortgage as removed and mother's mortgage as being removed. *Id.* at 20.

Grife made most, if not all, of the interest payments to Judge Silberstein. *Id.* at 88. Grife approached Judge Silberstein for a second loan. This time, however, because the judge was concerned about the amount of equity in the house and because he was not satisfied with the timeliness of Grife's payments, Judge Silberstein refused to make a second loan. *Id.* at 89.

After being turned down by Judge Silberstein, Grife sought out another friend, David Ghen, to lend him the money. With Grife present, mother assigned her $20,000 mortgage to Ghen in exchange for $10,000. N.T. 9/23/92 at 12. Soon afterward, Grife went into bankruptcy. Northwood foreclosed on the Northampton house. Shoppers assigned its $11,800 mortgage to a title insurance company, Title U.S.A., in exchange for $2,500. N.T. 7/12/93 vol. 2 at 80–82. At foreclosure, North-

wood received $132,000, while Ghen assigned his $20,000 mother mortgage to Title U.S.A. in consideration for $14,600. N.T. 7/12/93 vol. 1 at 78; N.T. 9/23/92 at 18. Judge Silberstein never collected any of the principal of his loan to Grife. Subsequently, Grife was prosecuted and convicted of theft by deception.

On appeal, Grife argues that the evidence was insufficient to convict him. We disagree.

■ "It is well established that the test for determining the sufficiency of the evidence is 'whether, viewing all of the evidence admitted at trial, together with all reasonable inferences therefrom, in the light most favorable to the Commonwealth as verdict winner, the trier of fact could have found that the defendant's guilt is established beyond a reasonable doubt.'" *Commonwealth v. Rainey*, 540 Pa. 220, 656 A.2d 1326, 1330 (quoting *Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833 (1985), *cert. denied*, 475 U.S. 1150, 106 S.Ct. 1804, 90 L.Ed.2d 349 (1986)).

There is no doubt that Grife misrepresented the mortgages he took out on the Northampton home in order to procure further loans. Both orally and in writing, he actively concealed the $11,800 Shoppers mortgage to all of the subsequent lenders. That he initially satisfied this mortgage is irrelevant, as he used that same mortgage to secure a subsequent loan. In addition, he never recorded the satisfaction of the mortgage to mother, despite representing to Northwood, Financial, and Judge Silberstein that mother's mortgage was being removed. It was after he misrepresented the status of mother's mortgage that Grife colluded to have it assigned to Ghen, a bona fide purchaser.

■ The statute under which Grife was convicted provides in part: "A person is guilty of theft [by deception] if he intentionally obtains or withholds property of another by deception." 18 Pa.C.S.A. § 3922(a). An element of theft by deception is that Grife intended to deprive the lenders of their property. *See Commonwealth v. Bruce*, 414 Pa.Super. 419, 607 A.2d 294 (1992). Grife maintains that the Commonwealth

has failed to establish this element of the crime, because it did not prove beyond a reasonable doubt that Grife intended to deprive the lenders of their money.

We agree that some attempt was made by Grife to pay off some of the loans. He paid off the second Shoppers mortgage. By Judge Silberstein's own admission, Grife paid off most of the interest on the Silberstein loan according to the terms of that loan.

■ The gravamen of the crime of theft by deception, however, is the fraudulent taking of the property of others. That Grife might have had plans to pay the creditors back is of no moment.[4] What Grife did was put the property entrusted to him by the lenders significantly more at risk than the mortgagees realized. When a borrower places the property of another at risk of destruction or loss, and this risk is unknown to the lender because of an intentional misrepresentation of the borrower, the borrower has committed theft by deception by defrauding the lender.

We are persuaded by the reasoning of the Maryland Court of Special Appeals, which noted the following:

One who is asked to lend money or to sell goods on credit has a right to determine for himself whether he chooses to be a secured creditor or an unsecured creditor, and if he chooses to be the former he has a right to know about the security. One who has extended credit in reliance upon a mortgage on real estate which is falsely represented to be a first mortgage when in fact it is subject to a prior recorded mortgage for more than the land is worth, or is a mortgage upon property which the mortgagor does not own, has been defrauded, even if the debtor has an intent to pay the debt. The lender intended to be a secured creditor but by reason of the false representation his position is for all practical

---

4. We observe that it was Grife's habit to pay a prior loan with the proceeds of a subsequent one. While many Americans unwisely roll over debts from one lender to another, at some point unsound fiscal management becomes a pyramid scheme, especially when all the creditors have their loans secured by the same over-mortgaged piece of property.

purposes that of an unsecured creditor. There is an obvious and unreasonable risk of loss which has been forced upon him, without his knowledge or consent, by reason of the deceit. This *risk* which the creditor did not intend to assume was imposed upon him by the *intentional* act of the debtor, and this amounts to an intent to defraud.

*Baskerville v. State*, 23 Md.App. 439, 446, 327 A.2d 918, 922 (Md.Ct.Spec.App.1974) (quoting Perkins, *Criminal Law*, (2d Edition 1969) at 312–13).

The *mens rea* for theft by deception is this intent to defraud. Grife's purposeful intent to give his lenders less than what they bargained for in order to procure their property evidenced the guilty-mind requirement of the Crimes Code. Falsifying the mortgage record and deceiving the mortgagees with it was the wrongful deed.

■ Section 3922 of the Crimes Code, our theft-by-deception statute, was meant to broaden the law of "false pretense." *See* 18 Pa.C.S.A. § 3922—Official Comment–1972; *see also Commonwealth v. Imes*, 424 Pa.Super. 633, 637–38, 623 A.2d 859, 862 (1993) (noting that theft by deception was the crime of attempted false pretenses). We are persuaded by the thoughtful analyses of the courts of sister states which have held that, in cases such as the one *sub judice*, an intent to repay the loan or return the property does not necessarily ameliorate defendant's guilt. *See, e.g., State v. Farrah*, 161 Conn. 43, 282 A.2d 879 (1971); *State v. Mills*, 96 Ariz. 377, 396 P.2d 5 (1964); *Adams v. State*, 650 So.2d 1039 (Fla.App.1995); *Thompson v. State*, 585 So.2d 492 (Fla.App.1991), *opinion adopted*, 607 So.2d 422 (1992); *Baskerville, supra; Rosengarten v. State*, 171 So.2d 591 (Fla.App.), *cert. denied*, 177 So.2d 476 (Fla.1965).

We agree with the following persuasive commentary in *Baskerville* that an intent to repay does not necessarily negate the crime of false pretenses.

Instructive in this regard is Clark and Marshall's *Law of Crimes* (Wingersky Edition, 1958) at 823:

> "If a person, however, obtains money or goods by false pretenses, he is none the less guilty because he intends to repay the money or pay for the goods, for 'an intent to defraud is consistent with an intent to undo the effect of the fraud if the offender should be able to do so.' That there is ability as well as intent to repay is no defense. Even an offer to repay or actual payment is no defense."

*See Commonwealth v. Schwartz,* [13 Ky.L.Rptr. 929,] 92 Ky. 510, 18 S.W. 775 [ (1892) ]; *People v. Oscar,* 105 Mich. 704, 63 N.W. 971 [ (1895) ].

The same point is made in 32 Am.Jur.2d *False Pretenses,* § 33, "Intent to defraud," at p. 197:

> "If an accused had the requisite intent, he may be guilty of obtaining money or property by false pretenses even though he may have intended to repay the money or restore the property."

*See also* Perkins, *Criminal Law* (2d Edition, 1969) at 312–313:

> "It is now necessary to emphasize that an intent to repay will not necessarily prevent guilt of this crime....["]

23 Md.App. at 445–56, 327 A.2d at 922.

In a similar vein, the Florida Court of Appeals summarized what it means to intentionally defraud, to-wit:

> A man is defrauded if, by intentionally false representations of fact he has been induced to make a donation, or has been induced to pay money or to deliver property upon receipt of something quite different from what he understood he was getting or *has been induced to lend money upon the strength of security which is not what it is represented to be.*

*Rosengarten,* 171 So.2d at 595 (quoting Perkins, *Criminal Law* (1957) at 268) (alteration in original).

In his appeal, Grife cites for support the following cases: *Commonwealth v. Gallo,* 473 Pa. 186, 373 A.2d 1109 (1977); *Commonwealth v. Bruce, supra; Commonwealth v. Peduzzi,* 338 Pa.Super. 551, 488 A.2d 29 (1985); and *Common-*

*wealth v. Bentley,* 302 Pa.Super. 264, 448 A.2d 628 (1982). He maintains that these cases support the proposition that a defendant cannot be found guilty of theft by deception without proving a concurrent intent not to repay the victims. As we have stated, simply having a good intention to repay money that one has lied to procure and then placed at an unreasonable risk of loss is not enough to avoid criminal liability, however.

The cases cited by Grife are distinguishable from the case *sub judice.* In *Gallo,* the deception was held not to be a misrepresentation as to a material fact affecting the contract. *Gallo,* 473 Pa. at 189–90, 373 A.2d at 1111 (holding that a sole proprietor who held himself out as an account representative of a national company had not misrepresented a matter that had pecuniary significance). Here, however, the lenders would not have made the loans but for the doctored title searches.

In *Bruce,* a lumber broker/wholesaler, who had received an extension of credit, did not use deceit to procure any unpaid-for merchandise, but rather lied to his supplier about not having received the necessary payments from his own buyer after he fell behind in his payments. *Bruce,* 414 Pa.Super. at 421–22, 607 A.2d at 296 (holding that the evidence was insufficient to prove that appellant did not intend to pay for the lumber he received). In the instant case, however, Grife specifically misrepresented the value of the mortgages before he received the loans.

In *Bentley,* the only deceit the Commonwealth could point to was the fact that the appellant, a building contractor, had used some of the proceeds from a home repair contract for unrelated business purposes. *Bentley,* 302 Pa.Super. at 270, 448 A.2d at 632. As this was not barred by the contract between appellant and complainants, however, we held that the evidence was insufficient to prove that appellant committed theft by deception. *Id.* at 268–69, 448 A.2d at 631–632 ("Our review of the record fails to show any evidence as to appellant's intent, except his failure to perform. This alone is

insufficient."). Here, however, Grife clearly deceived the mortgagees as to a material aspect of the loans.

In *Peduzzi,* an automotive parts store owner borrowed money, purportedly to purchase spark plugs, spark plug wires, and oil filters. *Peduzzi,* 338 Pa.Super. at 555–56, 488 A.2d at 32. The defendant, Alfred Peduzzi, testified that the spark plugs he purchased were cracked and had no value. *Id.* The trial court found Peduzzi's testimony incredible. He was convicted following a bench trial for theft by failure to make required disposition of borrowed money. *Id.* at 553, 488 A.2d at 30. This was overturned following post-trial motions, however, and the trial court instead amended its verdict and found Peduzzi guilty of theft by deception. *Id.*

We held that the altering of the verdict after trial was error. *Id.* at 553–54, 488 A.2d at 31. Additionally, we went on to state that the evidence was insufficient to find Peduzzi guilty of theft by deception, as the fact that he might have lied about the quality of the spark plugs did not in fact prove that he indeed failed to purchase them. *Id.* at 553–54, 557–59, 488 A.2d at 31, 33. Therefore, that Peduzzi misrepresented the reason he failed to repay his lenders did not necessarily mean that he never intended to pay them. Once again, because Peduzzi may have lied about something that occurred after the loans were procured is distinguishable from the case *sub judice,* where Grife's misrepresentations were a material prelude to the granting of the mortgages.

■ Grife is correct in stating that these cases support the proposition that mere failure to perform on a contract, or repay a loan, in and of itself does not constitute theft by deception. To hold otherwise would not only be contrary to the Crimes Code, but would also make our theft by deception statute the entrance way to debtor's prison.

Grife did more than simply fail to repay a loan, however. He defrauded his creditors as to the value of the mortgages they received. He stole money that the lenders could have put to better use, not because the loans eventually "went south," but because had the creditors known the true position

of their mortgages, and to what extent Grife had mortgaged the property, they would not have made those loans. Louis Kassen, attorney for Financial, testified that had Financial known its mortgage was in third position, it would not have lent Grife the money. N.T. 9/23/92 at 119. That was because Financial would not be able to sell a third-priority mortgage. *Id.* Malcolm Blumberg, who represented Northwood, testified that had he known about the $11,800 Shoppers mortgage, he would not have loaned Grife $100,000. *Id.* at 49–50. Blumberg stated that as this was the largest loan Northwood had made up to that time, it would not have accepted anything less than a first-priority mortgage. *Id.* at 50. When Judge Silberstein learned of the true equity in the house, he refused Grife a second loan. N.T. 7/13/93 at 89. Finally, regarding Ghen, it can be safely assumed that he would not have lent Grife and his mother $10,000 if he knew that his security was a fully satisfied mortgage.

In *Peduzzi* we stated that where the property appropriated from others was obtained in the form of a loan, "it was essential that appellant obtain[ed] the loans by deception intending not to repay the moneys borrowed" for a conviction of theft by deception to be affirmed. *Peduzzi*, 338 Pa.Super. at 557–59, 488 A.2d at 33 (citations omitted). We further stated that appellant's "intention not to repay the loans at the time the moneys changed hands was a matter of proof. It could not be inferred from the fact alone that he was unable subsequently to repay the moneys." *Id.* (citation omitted). Nevertheless, because in this case, absent the fraudulent representations, Grife would not have received the loans, we find this case distinguishable.[5]

 Except where a defendant may be held strictly liable for committing an offense, guilty knowledge or criminal intent is elemental to any misdeed. *In the Interest of G.T.*, 409 Pa.Super. 15, 19, 597 A.2d 638, 640 (1991) (citations

5. Because we held in *Peduzzi* that it was error for the trial court to alter its verdict after post-trial motions, our statements as to the insufficiency of the evidence were *obiter dicta,* and as such are not binding on this Court.

omitted). "Criminal intent may be established by direct or circumstantial evidence. 'It may be inferred from acts or conduct or the attendant circumstances.'" *Commonwealth v. Parker*, 387 Pa.Super. 415, 421, 564 A.2d 246, 249 (1989) (quoting *Commonwealth v. Russell*, 313 Pa.Super. 534, 543, 460 A.2d 316, 321 (1983), *allocatur denied*, 526 Pa. 632, 584 A.2d 315 (1990). Showing intent not to repay a loan is only one method of proving intent to commit theft by deception. Proof that a mortgagor took a loan he knew would not have been granted but for his own acts of deception, is another. Such an act cheats the lender of the time value of his money, the lost opportunity to better secure the loan or find a more suitable mortgagor, and the opportunity to negotiate a higher interest rate, not uncommon when a loan is perceived to be more at risk. Moreover, as we stated *supra*, it places the property of the lender at a greater risk of loss than he was otherwise led to believe. Where the evidence is sufficient to prove beyond a reasonable doubt that it was the borrower's intention to so defraud his creditors, a conviction for theft by deception will stand.

The defendant in *Peduzzi* "was an unorthodox, perhaps even incompetent, businessman who found it necessary to borrow frequently. His practice was to borrow significant sums of money at excessive rates of interest for relatively brief periods of time." *Peduzzi*, 338 Pa.Super. at 555, 488 A.2d at 32. Where Peduzzi seemed to be a poor and naive merchant who became overextended through high interest rates, in contrast, Grife was an experienced professional in conducting title searches who traded off that knowledge to dupe friends, business partners, and business acquaintances. Where the only lies the trial court found when erroneously convicting Peduzzi were in his explanations for his business losses,[6] Grife falsely represented the Northampton encumbrances at the beginning and all throughout his transactions with the various mortgagees. Thus, while we stated that

6. *See Peduzzi*, 338 Pa.Super. at 555–56, 488 A.2d at 32.

there was no evidence Peduzzi intended to defraud his lenders,[7] the evidence here, viewed in the light most favorable to the Commonwealth, is sufficient to prove that Grife misrepresented the value of the mortgage with the intent to defraud the lenders out of the true value of their loans, regardless that he might have hoped to return their property with interest.

 Even if we were to agree that Grife lacked the necessary intent to be convicted of theft by deception as that offense is defined in part (a)(1) of Section 3922,[8] we believe that Grife still committed theft by deception as it is defined in parts (a)(2) and (3) of that same section. Theft by deception is the machination of deceit to receive property that would not be given save for the falsehood. The first element of the offense is that a person intentionally "obtain[ ] or withhold[ ] property of another." Grife intentionally received money from the mortgagees that he knew the lenders wanted not only repaid but properly secured.

Grife also actively prevented the lenders from learning the true value of the mortgaged property by falsifying the mortgage record. These acts satisfy part (a)(2) of the definition of theft by deception, which states that "[a] person deceives if he intentionally ... (2) prevents another from acquiring information which would affect his judgment of a transaction." Moreover, acting as the title agent, Grife stood in a fiduciary relationship with his creditors. Thus he "fail[ed] to correct a false impression which the deceiver previously created or reinforced, or which the deceiver kn[ew] to be influencing another to whom he st[ood] in a fiduciary or confidential

---

7. *Id.* at 557–59, 488 A.2d at 33.

8. Theft by deception is defined in part: "A person is guilty of theft if he intentionally obtains or withholds property of another. A person deceives if he intentionally:

 (1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise."

 18 Pa.C.S.A. § 3922(a)(1).

relationship." 18 Pa.C.S.A. § 3922(a)(3).[9]

In sum, we hold that Grife committed theft by deception when he intentionally defrauded the lenders by obtaining a loan through deceiving the mortgagees on a matter of obvious pecuniary significance—the value of the mortgage given.

Judgment of sentence affirmed.

JOHNSON, J., concurs in the result.

---

**9.** See *Commonwealth v. Robichow,* 338 Pa.Super. 348, 487 A.2d 1000 (1985), *appeal dismissed,* 510 Pa. 418, 508 A.2d 1195 (1986), for a discussion of how the various theft offenses have been consolidated into a single offense by Section 3902 of the Crimes Code. *See* 18 Pa.C.S.A. § 3902 (Consolidation of theft offenses).