483 A.2d 369

**William L. LANE**

v.

**STATE of Maryland.**

**No. 73, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Nov. 9, 1984.

Edward S. Sobansky, Bladensburg, with whom was Kiefert & Sobansky, Bladensburg, on brief, for appellant.

Valerie V. Cloutier, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Andrew L. Sonner, State's Atty. for Montgomery County and Paul S. Lewis, Asst. State's Atty. for Montgomery County, on brief, for appellee.

Argued Before WILNER, BISHOP and ADKINS, JJ.

BISHOP, Judge.

A Montgomery County jury found appellant and his co-defendant, Donald Harmon, guilty of two counts of theft of property worth $300.00 or more from the Steed Mortgage Company. Md.Ann.Code 1957, art. 27, § 342 (1982 Repl. Vol.). The Court (McAuliffe, John, J.) sentenced him to three years incarceration with all but three months suspended in consideration of three years probation.

Appellant raises three issues:

I. That the evidence was insufficient to support a conviction for theft because adequate security was transferred to the mortgage company in exchange for the mortgage loans.

II. That the trial judge committed plain error by instructing the jury that "the value of the loan at the time the loan is made determines" whether appellant committed misdemeanor or felony theft.

III. That the trial judge abused his discretion in eliciting testimony injurious to appellant after defense counsel had ended their examination of the witness.

Co-defendant Harmon was in the business of purchasing, rehabilitating and reselling residential properties. Appellant, a real estate broker, was Harmon's principal agent for the sale of these properties. As much as 90 percent of the properties owned by Harmon were listed with appellant. Harmon paid appellant a commission of 4 to 6 percent of the selling price.

The bases for the convictions were appellant's activities regarding two of Harmon's properties, located at 7623 Barlow Road and 6611 Drylog Road in Prince George's County. There was evidence of a scheme to procure mortgage loans for purchasers of those properties from Steed Mortgage Company (later purchased by Gold Dome Realty Credit Company) (hereafter referred to as "Steed") through the use of "straw buyers" and falsified employment and loan documents.

The Court denied appellant's motion for judgment of acquittal in which he argued that because the loans were secured by a deed of trust on the real estate, there was no evidence that appellant intended to deprive Steed of its money. Alternatively, he argued that even if there had been a deprivation, its value was less than $300.00, making the offense a misdemeanor and not a felony. Art. 27, § 342(f). At the conclusion of all the evidence, the Court again denied appellant's motion for acquittal.

### Barlow Road

In 1981, Sylvia Elum and her husband, Keith, were Harmon's tenants in the Barlow Road property. Mr. & Mrs. Elum approached appellant inquiring about the purchase of

a home. Appellant suggested the Barlow Road property. Because Keith had a poor credit history, appellant, in order to assist the Elums in purchasing the Barlow Road property, procured Michael Paige to act as a "straw purchaser" with Sylvia Elum. In exchange for "lending his credit", appellant gave Paige a $300.00 rent credit on property Paige was renting from appellant. Paige certified falsely that he intended to live in the Barlow Road property.

Paige as principal borrower and Sylvia Elum a co-borrower applied to Steed for a mortgage loan in the amount of $47,450.00. On the application Sylvia Elum stated that she earned $708.33 per month as a bookkeeper for J & J Painting Services. At trial she testified that in fact she earned only $508.00 per month working as a housekeeper at the Georgetown Hotel. Paige's wage information was accurate. According to the application, their combined monthly income was $2,934.31; actually it was $2,734.80.

Appellant's son-in-law, Stuart Himes, testified that S & J Painting was his part-time business. One of the State's exhibits notes a change of addressee from "Jay & Jay Painting" to "S & J Painting". Apparently, on the loan application, "J & J" was intended to be "S & J".

S & J frequently cleaned and refurbished homes on appellant's behalf. At appellant's request and "as a favor to help someone qualify" Himes signed a blank form falsely verifying Sylvia Elum's employment with S & J. Himes had never met her.

Alison Himes, appellant's daughter and Stuart Himes' wife, was an employee in appellant's real estate office. She testified that on the blank application form, which her husband had signed, she filled in false information concerning Elum's position with S & J, her salary, length of employment and finally, probability of future employment, which she classified as "good".

Because there was also a problem with Michael Paige's qualifications, appellant induced Paige's co-worker, Willie

Taylor, to certify falsely that Paige was his nephew and that he was making a $3,000.00 gift to him.

Steed approved a loan for $47,450.00. A Steed mortgage underwriter testified that she would not have approved the loan to Paige and Elum in that amount with the agreed interest rate, had she known the true stati of the applicants.

At settlement Steed issued a check in the net amount of $44,411.02 payable to the settlement attorney and to the mortgagors, Paige and Elum. In exchange, Steed took from Paige and Elum a purchase money deed of trust on the property which referred to a contemporaneously executed promissory note. As listing broker, appellant received a commission of $1,998.00 and a bonus of $300.00. The purchase price of the property was $49,450.00, the amount of the appraisal at the time of the settlement.

Sylvia Elum testified that it was not until after they signed the "papers" that she realized her monthly payments to Steed would be $770.00. Because she was unable to make any of the payments, she moved out of the residence in April of 1982, five months after settlement. As a result of her default, Steed's successor corporation, Gold Dome Realty Credit foreclosed and a new owner took over the property.

### Drylog Road

At appellant's request, in exchange for a $500.00 fee paid to her by appellant, Pauline Cypress "lent her credit" in order to assist co-defendant Harmon's friend and sometime employee Phillip Dillon, Jr. to qualify for a mortgage to purchase Harmon's Drylog Road property. At no time did Cypress intend to live on the property. Appellant told her that he himself would own the property.

The Cypress and Dillon loan application correctly stated that Cypress was employed full time with the D.C. Office of Personnel and part time as a cashier in a liquor store with a total combined monthly earnings of $2,044.66. Falsely stated on the application was that Dillon was employed as a

foreman with R.J. & Sons Construction, earning $3,033.33 monthly. Cypress and Dillon falsely certified that they had a joint monthly income of $5,077.00.

Co-defendant Harmon's sister-in-law and bookkeeper, Sharon Harmon, testified that from July, 1981, to February, 1982, Dillon performed maintenance and yard work for Harmon on a sporadic basis and earned about $50.00 per job. There is nothing in the record indicating that Dillon had any steady income. He did not testify. Sharon Harmon also testified that her husband, Donald Harmon, co-defendant's brother, owned R.J. & Sons Construction and that Dillon not only never worked for that company as a foreman but the company did not employ a foreman.

Appellant's daughter, Alison Himes, testified that at meetings she attended with co-defendant Harmon, appellant, Harmon's secretary Kay Verhalen, and others, it was said that "they [co-defendant Harmon and appellant Lane] were going to give [Dillon] employment with R.J. & Sons ... [to help him] qualify for a particular house."

Although Dillon's employment verification was signed by a "Sharon Martin", Sharon Harmon's maiden name, the latter denied having signed it. The telephone number listed for R.J. & Sons Construction on the loan application was actually that of co-defendant Harmon's office. Harmon had instructed his secretary, Verhalen, who had in turn instructed Sharon Harmon, to answer the telephone with "hello" and to expect a call verifying Dillon's employment with R.J. & Sons Construction. Messages were to be taken and given to Harmon.

Steed approved the loan of $72,200.00. At settlement Steed issued a check in the net amount of $68,028.32 payable to the settlement attorney and mortgagors Dillon and Cypress. In exchange, Steed received a purchase money deed of trust from Dillon and Cypress securing the total amount of the loan. The deed of trust referred to a promissory note contemporaneously executed by Dillon and Cypress. Appellant received a commission of $2,800.00. A

Steed mortgage underwriter testified that the loan to Dillon and Cypress would not have been approved had she known the true facts underlying the application. There was testimony that the Drylog Road property was in the process of foreclosure, but it was not known whether the process had been completed. An appraiser testified that the property had a value of $77,500.00 at approximately the time of settlement.

Pauline Cypress testified that after she was contacted by Montgomery County State's Attorney investigators, she falsely told them, at appellant's direction that: (1) she was planning to move into the Drylog Road property with Dillon and that her son was going to help with the payments; (2) she had not moved into the house because of recent surgery.

### Sufficiency of the Evidence

Appellant's conviction must be affirmed if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Tichnell v. State*, 287 Md. 695, 717, 415 A.2d 830 (1980). The legislature revised the theft laws in 1979 in order to create a "single consolidated offense designated as 'theft'... The purpose of this revision [was] to eliminate [the] technical and absurd distinctions that have plagued the larceny related offenses and produced a plethora of special provisions." *Joint Subcommittee on Theft Related Offenses, Revision of Maryland Theft Laws and Bad Check Laws*, p. 2 (October, 1978). Under the new law "[c]onduct designated as theft ... constitutes a single crime embracing, among others, the separate crimes heretofore known as larceny, larceny by trick, larceny after trust, embezzlement, false pretenses, shoplifting and receiving stolen property." Md.Ann.Code 1957, art. 27, § 341 (1982 Repl.Vol.).

While the statute codifies a single offense called "theft", it sets forth several different methods for its commission:

A person commits a theft whenever with the intention to deprive the owner of the property, he: (a) obtains or exerts unauthorized control of the property of another, (b) obtains control over the property of another by deception, (c) obtains the services of another person by deception, (d) possesses lost, mislaid or mistakenly delivered property and he knows or can reasonably ascertain the identity of the true owner; or (e) possesses stolen property knowing or believing that it had been stolen."

Gilbert & Moylan, *Maryland Criminal Law: Practice and Procedure*, § 19.5 (1983) (Citations Omitted); Art. 27, § 342(a)–(e). If the evidence against appellant was sufficient to prove theft under any subsection of § 342, the court may affirm. *See* Art. 27, § 341; Gilbert & Moylan, *supra*, § 19.1, pp. 204–205, ("the careful practioners of law will demand particulars from the prosecution in order to ascertain precisely the offense alleged to constitute theft.")

 We hold that evidence was sufficient for a rational trier of fact to conclude that appellant was guilty of theft by deception. Art. 27, § 342(b). That subsection provides:

(b) Obtaining control by deception.—A person commits the offense of theft when he willfully or knowingly uses deception to obtain and does obtain control over the property of the owner, and;

(1) Has the purpose of depriving the owner of the property; or

(2) Willfully or knowingly uses, conceals or abandons the property in such manner as to deprive the owner of the property; or

(3) Uses, conceals or abandons the property knowing such use, concealment, or abandonment probably will deprive the owner of the property.

Appellant concedes that he procured and then induced both Michael Paige and Pauline Cypress to certify falsely to Steed that they were co-purchasers and future residents of

the Barlow Road and Drylog Road properties, respectively. Also, it is clear that neither of the actual purchasers would have individually qualified for the respective mortgages. Appellant personally arranged for the false employment verification of Elum and was implicated in the false employment verification of Dillon.

The jury could have and apparently did conclude that had appellant not engaged in these acts of deception and had Steed been aware of the financial stati of the real purchasers, Steed would not have parted with its money. From this fact, the jury could fairly infer that appellant used deception to obtain control of the property of Steed. Art. 27, § 340(h) provides that "Property [under § 342] means anything of value, including, but not limited to . . . (2) money (3) commercial instruments. . . ."

That the checks were issued to the purported "home buyers" and not to appellant is irrelevant under the statute. " 'Obtain' means: (1) in relation to property, to bring about a transfer of interest or possession *whether to the offender or another* . . ." Art. 27, § 340(f) (Emphasis added).

Before this Court appellant maintained, despite the evidence, that because Steed received a purchase money deed of trust securing the amount of the loans, and because the State failed to show any pecuniary loss to Steed upon foreclosures of the Barlow Road and Drylog Road properties, there was no evidence that he deprived Steed of any property. Without a loss or deprivation, he argues, there is no theft under the statute. Appellant urges the Court to adopt the holding of the Georgia Supreme Court in the case of *McGhee v. State,* 97 Ga. 199, 22 S.E. 589 (1895). The appellant in that case was convicted under Georgia's 1895 cheating and swindling statute, § 4587. Although the state had shown that appellant procured a loan by misrepresenting that the security was unencumbered, the court reversed the conviction because there was no proof from the creditor that he had suffered any pecuniary loss upon foreclosure. Not only are the facts distinguishable from the case at bar,

but its holding is contrary to the majority of other jurisdictions which do not require proof of loss. *See, e.g., Nelson v. United States,* 227 F.2d 21, 23 (D.C.Cir., 1955) (where defendant misrepresented extent of prior encumbrance on collateral used to secure payment for goods transferred and creditor relied on misrepresentation in transferring property, the fact that collateral actually had value in excess of loan held no defense to charge of obtaining property by false pretenses). *State v. Hines,* 36 N.C.App. 33, 243 S.E.2d 782, 787 (1978); *Annot.* 53 A.L.R.2d 1215 (1957).

■ Furthermore, neither the current theft statute nor analogous prior case law requires proof of loss "as an essential element of the crime." Appellant correctly notes that case law decided under Maryland's former "false pretenses" statute [1] required a showing that the victim relied on the defendant's misrepresentation "to his detriment". *Polisher v. State,* 11 Md.App. 555, 556, 276 A.2d 102, *cert. denied,* 262 Md. 749, *cert. denied,* 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971). This Court, however, held explicitly that

[t]he gravamen of the offense is in the making of the false pretense with intent to defraud and thereby obtaining another's property. *So it is not essential that the victim suffer a permanent loss or that he sustain a pecuniary loss.*

*Baskerville v. State,* 23 Md.App. 439, 443, 327 A.2d 918 (1974) *cert. denied,* 274 Md. 725 (1975) (*quoting,* 32 Am. Jur.2d, False Pretenses, § 38 p. 200 (1982 ed. at p. 262) (Emphasis added).

Consistent with this approach, the theft statute prohibits the act of obtaining unauthorized control over the property of another, when the offender either

---

1. Art. 27 former § 140 provided in part: "Any person who shall by a false pretense obtain from any other person any chattel, money or valuable security with the intent to defraud any person of the same shall be guilty of a misdemeanor ..." (repealed as of July 1, 1979).

(1) *Has the purpose of depriving* the owner of the property; *or*

(2) Willfully or knowingly uses, conceals or abandons the property *in such manner as to* deprive the owner of the property; or

(3) Uses, conceals or abandons the property knowing such use, concealment or abandonment *probably will deprive* the owner of the property.

Art. 27, § 342(a)(1)–(3); (b)(1)–(3); (c)(1)(i)–(iii) (emphasis added). Under the plain language of the statute, actual deprivation to the owner is merely one circumstance from which the jury may infer that the offender committed the prohibited act with the requisite criminal intent.

From the evidence in this case, a jury could reasonably infer that appellant obtained control of the property of Steed with the intent to deprive the lender of its money. As a matter of law, Steed was in fact so deprived. Art. 27, § 340(c) provides:

(c) "Deprive" means to withhold property of another: ...(2) for such a period as to appropriate a portion of its value.

Appellant appropriated a portion of the value when the money was used, at least partially, to fund his commissions and bonus.

Appellant relies heavily on the fact that a purchase money deed of trust was transferred to Steed, securing future repayment of the fraudulently obtained loans. At best such security was merely evidence of an intent to repay the stolen money.

If a person ... obtains money or goods by [deception], he is none the less [sic] guilty because he intends to repay the money ... That there is ... intent to repay is no defense. Even ... actual repayment is no defense. [Since] [t]he offense is complete when money or property has been obtained by false representations ... it cannot be purged by subsequent restoration or repayment...

*Baskerville v. State,* 23 Md.App. 439, 443–445, 327 A.2d 918 (1974) (*quoting, Clark & Marshall's Law of Crimes,* at 823 (Worgersky Ed., 1958) and 32 Am.Jur.2d, False Pretenses, § 38 (1982)). Although the appellant in *Baskerville* was convicted under our old false pretenses statute, it is clear that the legislature, when enacting § 342, intended to include all those activities which had been criminal under the repealed larceny related statutes. *See* Art. 27, § 341.

■ Even if intent to repay were a defense, appellant could not have reasonably believed the loan would be repaid, in full, with interest, pursuant to the documents executed by the purchasers. Since appellant knew of the purchasers' respective incomes, a jury could infer that appellant allowed the security to be transferred knowing that the purchasers' underlying promise to pay was not reasonably likely to be performed. Therefore, the transfer of the deed of trust, being no less an act of deceit than the loan which it secured, only serves to support further the conclusion that appellant intended to deprive Steed of its money.

Finally, Steed bargained for, and had a primary right to receive, repayment pursuant to the loan documents. What it got was the burdensome, costly and necessarily risky alternative of foreclosure.

> If by reason of false representations [regarding] the debtor, the creditor has assumed a substantially greater risk than would have been his if the debtor's [qualifications] had been true,... the crime is satisfied even if the security is not entirely worthless, or even if it may turn out to be adequate... There is an obvious and unreasonable *risk* of loss which has been forced upon [the creditor], without his knowledge or consent, by reason of the [wrongdoer's] deceit.

Perkins, *Criminal Law,* 312–313 (2d Ed.1969).

Conceding, *arguendo,* that he did commit theft, appellant argues in the alternative that the evidence was insufficient

to support a finding of felony theft. Art. 27, § 342(f) provides in part:

(1) A person convicted of theft where the property or services that was the subject of the theft has a value of $300.00 or greater is guilty of a felony...

(2) A person convicted of theft when the property or services that was the subject of the theft has a value of less than $300.00 is guilty of a misdemeanor.

The statute defines value as "the market value of the property ... at the time and place of the crime ... [I]f the market value cannot be satisfactorily ascertained, [value means] the cost of replacement of the property within a reasonable time after the crime." Art. 27, § 340($l$)(1).

Appellant argues that the "market value" of the fraudulently obtained loans must be measured by the amount of lost profit to Steed. Since there was no evidence of lost profit, their value must be measured by replacement cost, which according to appellant, can only be shown by evidence that Steed suffered a deficiency upon the foreclosure sales of the two properties. Since there was no such alternative evidence, appellant claims that under section 340($l$)(4), the jury could only have convicted him of misdemeanor theft. That subsection provides:

When it cannot be determined if the value of the property is more or less than $300.00 ... its value shall be determined to be an amount less than $300.00.

Whether a theft is a felony or a misdemeanor depends on the value of the property *that was the subject of the theft.* § 342(f)(1) and (2), *supra.* The subject of this theft was the loan itself. The market value of the loan "at the time and place of the crime" was evidenced by the amount of money obtained by each of the purchasers on the settlement date. That Steed parted with over $120,000.00 as a result of appellant's actions cannot reasonably be denied. *See e.g., Smith v. State,* 237 Md. 573, 580, 207 A.2d 493 (1965) *aff'd sub nom Smith v. Warden, Maryland House of Correction,* 280 F.Supp. 827 (D.Md.1968) (amount

of loss sustained by defrauded creditor equals entire amount loaned to defendant.)

Consistent with our approach is *La Moyne v. State*, 53 Tex.Cr.R. 221, 111 S.W. 950 (1908), used by Judge McAullife in rejecting appellant's value argument in that court. The appellant in *La Moyne* was charged with swindling in excess of $50.00, a felony. The trial judge had instructed the jury that if it found that appellant had swindled less than $50.00, it would be a misdemeanor. The Texas Court of Criminal Appeals stated:

> The learned trial judge seems to have labored under the impression that, from the fact that the prosecuting witness did not suffer a financial loss of over $50 by the transaction, it would not be a felony. This is not the law. If prosecuting witness by means of false and deceitful pretenses on the part of appellant was induced thereby to part with $250 worth of property, the fact that the same was subsequently secured and most of the value of the property obtained would not be any character or kind of legal defense to the prosecution, and in fact would not be legitimate evidence to be introduced in the trial of the case.

*Id.* at 950. Because the evidence "conclusively show[ed] a swindling in excess of $50", the *La Moyne* court held that it was error to instruct the jury on the misdemeanor offense. *Id.*[2]

### Jury Instructions

■ Appellant next contends that the trial judge committed plain error in instructing the jury:

> ... how do we value the so-called loss? Well, from what I have said, I think it is apparent to you it is the value of the loan at the time that the loan is made that determines the question of value without any regard to amounts that may have been repaid ... the crime is

---

**2.** La Moyne was convicted of the misdemeanor, however, so any error in the instructions was harmless to him.

complete upon the making of the loan, and the value—the question of how much has been stolen...—is dependent on how much money was involved in the loan, how much was in fact actually disbursed...

Appellant did not object to the instruction "before the jury retired." M.R.P. 757(f). Therefore, he relies on former Rule 757(h) which provides:

An appellate court ... upon the suggestion of a party, may take cognizance of and correct any plain error in the [jury] instructions, material to the rights of the defendant even though the error was not objected to as provided by... this Rule.

The Rule is now new Rule 4–325(e).

As previously noted, the value of the "subject of the theft", Art. 27, § 342(f) "at the time and place of the crime", § 340($l$)(1), is the amount of loan money obtained by the purchasers on the settlement date. *Smith v. State*, 237 Md. at 579–80, 207 A.2d 493; *La Moyne v. State*, 53 Tex.Cr.R. 221, 111 S.W. 950. Accordingly, there was no error at all in the challenged instruction.

### Questioning by the Trial Judge

Appellant's final allegation of error involves the trial judge's questioning of State's witness, Alison Himes, appellant's daughter. On direct examination, Mrs. Himes testified that she had seen Sylvia Elum's employment verification form, that she knew her husband had signed it, she knew the verification was false and that she did not know why she did not tell her father that something was wrong. Neither attorney elicited any information from her as to where the form came from, who filled it out or how Mrs. Himes knew the information contained in the form was false.

In order to obtain that information, at the conclusion of all questioning by both the State and the defense, the trial judge questioned Mrs. Himes as follows:

THE COURT: I would like you to take a look at State's Exhibit No. 23, which is a request for verification of employment, having to do with Sylvia Elum. Have you ever seen that before?

MR. HELFAND: With all due respect, Your Honor, may I object.

THE COURT: Yes, you may. Overruled.

THE WITNESS: Yes, I have.

MR. HELFAND: I don't want to interrupt you, but can I have it to your whole line of questioning?

THE COURT: Yes. I will give you a continuing objection.[3]

MR. SOBANSKY: And I also, Your Honor.

THE COURT: Certainly.

Just tell us briefly what involvement you had with that verification.

THE WITNESS: I filled out the individual blocks on him, and my husband signed it.

THE COURT: You filled out which blocks?

THE WITNESS: The base pay, the earnings last 12 months, number of hours worked, probability of employment, length of applicant's employment, position, job title, and the applicant was employed—

THE COURT: For what reason did you do that?

THE WITNESS: Because if she needed to have a job, and—so that she could buy the house that she and Mr. Paige ended up buying.

THE COURT: Did you do this on your own initiative, or at the request of someone else?

THE WITNESS: It was at the request.

THE COURT: Of whom?

THE WITNESS: I don't remember who the requester was. I do know it was asked that because her and her husband were going to be living in the house, that she

---

**3.** Not permitted under the rules in force at the time of the trial, but permitted under the new Rule 4–322(b).

needed a job, to qualify to buy it, and I know her husband—they tried to have her husband on the house, and her husband was not able to buy with her because of his credit.

THE COURT: Well, I understand that. But there came a time when it came to your attention as a processor that the loan was not likely to be approved because she didn't have a job?

THE WITNESS: Yes.

THE COURT: And did you discuss that fact with anyone else?

THE WITNESS: About her not having a job?

THE COURT: About the problem with the loan, unless she did show a job.

THE WITNESS: Ms. Vernon.

THE COURT: What I want to know is, whose idea was it to provide information that she had a job, when in fact she did not?

THE WITNESS: I would have to say it was my father.

THE COURT: All right.

■ Appellant contends that the Court abused its discretion by unfairly eliciting testimony prejudicial to appellant. It is well settled that "the trial court has the right to examine a witness in order to elicit information which will help the jury determine the issues." *Bailey v. State*, 6 Md.App. 496, 509–510, 252 A.2d 85, *cert. denied*, 255 Md. 739 (1969); *Madison v. State*, 200 Md. 1, 12, 87 A.2d 593 (1952).

■ The appellant here, as in *Bailey*, does not claim that the judge's questions were objectionable themselves. He objects to the judge's role in eliciting information injurious to him. It is not improper, however, "for a trial judge presiding at a jury trial to examine a witness on matters admissible in evidence…" *Sim-Kee Corp. v. Hewitt*, 13 Md.App. 296, 299, 282 A.2d 525 (1971), where, as here, the prior testimony is unclear, evasive or equivocal. *Id.; Glad-*

*den v. State,* 20 Md.App. 492, 498, 316 A.2d 319, *aff'd,* 273 Md. 383, 330 A.2d 176 (1974).

It does not appear from the record that Judge McAuliffe "manifested an opinion adverse to appellant or to the defense upon which he sought to rely." *Rickards v. State,* 129 Md. 184, 190, 98 A. 525 (1916). It appears that the judge's questions were designed to elicit and clarify the full facts "in furtherance of the search for truth, which is the ultimate end and reason for being of the trial process." *Gladden,* 20 Md.App. at 498, 316 A.2d 319; *Kelly v. State,* 16 Md.App. 533, 545, 298 A.2d 470, *aff'd,* 270 Md. 139, 310 A.2d 538 (1973); *King v. State,* 14 Md.App. 385, 394, 287 A.2d 52 (1972). There was no abuse of discretion.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.