33 A.3d 468

STATE of Maryland

v.

Leon Thomas COLEMAN, Jr.

No. 14, Sept. Term, 2011.

Court of Appeals of Maryland.

Dec. 15, 2011.

Brenda Gruss, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for petitioner.

Elizabeth M. Walsh, Assigned Public Defender (JonesDay, Washington, D.C.; Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

ADKINS, J.

In this case, we consider the State's effort to criminalize the breach of residential construction contracts. We are asked to determine whether the evidence adduced at trial was sufficient to convict the Respondent, Leon Thomas Coleman, Jr., of theft by deception under Md.Code (2009), § 7–104(a) of the Criminal Law Article. We are also asked to determine whether the Deposits on New Homes Subtitle ("Act"), Md.Code (1998, 2010 Repl.Vol.), § 10–301(a) of the Real Property Article, applies to money received in exchange for land without a residential unit on it.

After Coleman failed to perform eight construction contracts for detached homes, he was convicted of eight counts of theft by deception and eight counts of failure to escrow under the Act. The Court of Special Appeals reversed all sixteen convictions, holding that the Act did not apply and that there was insufficient evidence of intent to support the theft convictions. We granted *certiorari*, *State v. Coleman*, 419 Md. 646, 20 A.3d 115 (2011), and answer the following questions:

1. Did Respondent's breach of contract give rise to a criminal action for theft?

2. Is a transfer of property from the victim to a party other than the defendant a "transfer of interest or possession" within the meaning of the theft statute?

3. May intent to commit theft by deception be inferred based upon facts occurring after the date the defendant allegedly obtained or exerted control over the property of the victim?

4. Does the Deposits on New Homes Act apply when the land and new residential unit are not conveyed simultaneously?[1]

---

1. The State presented three questions, including three sub-parts, which we have condensed.

We shall affirm the Court of Special Appeals. The evidence was insufficient to conclude that Coleman intentionally deprived the buyers of their property, as required under the theft statute.[2] Thus, like the Court of Special Appeals, we assume, without deciding, that a breach of contract may give rise to a criminal action for theft in some circumstances. We also confirm our precedents establishing that (1) a transfer of property from the victim to a party other than the defendant is a "transfer of interest or possession" within the meaning of the theft statute and (2) intent may be inferred based on acts subsequent to the alleged crime. Finally, we hold that the plain meaning of the Act indicates that it did not apply to Coleman.

### Facts and Legal Proceedings

In February and March of 2004, Coleman entered into contracts to convey eight lots in a subdivision and build homes on those lots.[3] The subdivision was called Kings Grant Court, a collection of eleven lots in Prince George's County. Earlier that year, Coleman had acquired the right to purchase Kings Grant Court for $550,000.[4]

---

2. In reversing Coleman's theft convictions, the Court of Special Appeals relied on a different aspect of the *mens rea* requirement, i.e., the intent to *deceive*. *Coleman v. State*, 196 Md.App. 634, 653, 11 A.3d 326, 327 (2010) ("[T]he State failed to prove beyond a reasonable doubt that appellant had the intent to deceive the purchasers necessary to sustain a conviction for theft by deception."). Because we hold that the evidence was insufficient to find intent to *deprive*, an argument raised specifically by Coleman on appeal, we need not decide whether the evidence was sufficient to find intent to *deceive* or whether the Court of Special Appeals applied the correct standard of review to that question. *See Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 637, 994 A.2d 411, 430 (2010) ("[W]e affirm, albeit on somewhat different grounds, the judgment of the Court of Special Appeals[.]"); *Buxton v. Buxton*, 363 Md. 634, 658, 770 A.2d 152, 166 (2001) ("[W]e have affirmed [the Court of Special Appeals'] determination on a different ground.").

3. Two additional buyers entered into contracts later that year, but those buyers did not testify at trial.

4. Coleman performed these transactions through a corporation called Opportunity Investment Group.

The contracts provided that the buyers would purchase the unimproved lots before their homes were constructed. Seven of the eight contracts identified the price of the unimproved lots, which ranged from $89,959 to $100,000. For at least seven of the eight lots, this price was at or below the appraised value of the land at the times the contracts were executed. The total price under the contracts ranged from $256,000 to $360,891, inclusive of constructing the homes.

The buyers paid for the unimproved lots by obtaining loans with an initial advance for the purchase of the land. At closing, Coleman used the initial advances to purchase one lot for each buyer and convey title by deeds to them. He received $667,993.19 from the advances and used $500,000 of it to buy the lots.

The remaining balance on the buyers' loans was held in escrow by the lenders pursuant to a draw schedule under which Coleman would make draws to cover his ongoing construction costs. To make draws, Coleman would have needed to certify that materials were received or work was done, that payment was due, and that the Bank had inspected and approved the work or materials. Coleman never applied for any construction draws, however, because construction never went forward. The only payments that Coleman received from the buyers were the initial land advances, used to purchase the lots, and amounts ranging from $900 to $3500 for paper work costs such as blueprints and site plans.

Construction never went forward because Coleman ran out of money before he was able to obtain the required permits. He had hired MDB Design Group LLC on June 30, 2004, to prepare drawings and designs and obtain the permits. His contract with MDB provided that its work would be completed by August 31, 2004. He also consulted a builder about the project and retained two individuals to process permits and provide real estate consulting. When MDB failed to obtain the permits by the deadline, Coleman contacted James Reid, CEO of Civtech Designs, Inc., to discuss replacing MDB.

Coleman extended MDB's deadline to November 10, 2004, but MDB again failed to meet it, so he retained Civtech on November 12, 2004, to do the work that MDB was supposed to have done. He notified the buyers of this change on December 3, 2004, stating that he would still be able to complete the project. By the end of December, however, Coleman's operating account had a negative balance and he began to ignore inquiries from the buyers. Ultimately, the buyers either filed for bankruptcy, had their lots foreclosed, or refinanced or modified their loans.

### Sufficiency of the Evidence for Theft by Deception

■ When reviewing a criminal conviction for sufficiency of the evidence, "[w]e will consider the evidence adduced at trial sufficient if, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Facon v. State,* 375 Md. 435, 454, 825 A.2d 1096, 1107 (2003) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)); *see also Winder v. State,* 362 Md. 275, 325, 765 A.2d 97, 124 (2001) (holding that a conviction must be upheld when "the record evidence could reasonably support a finding of guilt beyond a reasonable doubt").

The prosecution needed to prove that Coleman "obtain[ed] control over property by willfully or knowingly using deception" with one of these states of mind:

(1) intends to deprive the owner of the property;

(2) willfully or knowingly uses, conceals, or abandons the property in a manner that deprives the owner of the property; or

(3) uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.

Md.Code § 7–104(b) of the Criminal Law Article. The statute defines "deprive" as

to withhold property of another:

(1) permanently;

(2) for a period that results in the appropriation of a part of the property's value;

(3) with the purpose to restore it only on payment of a reward or other compensation; or

(4) to dispose of the property or use or deal with the property in a manner that makes it unlikely that the owner will recover it.

Md.Code § 7–101(c) of the Criminal Law Article.

▪ Property can be "obtained," for purposes of theft by deception, even when it is transferred to a third party. Maryland Code § 7–101(g) of the Criminal Law Article (" 'Obtain' means ... in relation to property, to bring about a transfer of interest in or possession of the property[.]"); *Cicoria v. State,* 332 Md. 21, 32, 629 A.2d 742, 747 (1993) (observing that "obtain," for purposes of theft, means "to bring about a transfer of interest or possession, whether to the offender or to another").

▪ The requirement of intentional deprivation makes theft a specific intent crime. *Jones v. State,* 303 Md. 323, 340, 493 A.2d 1062, 1070 (1985) ("To steal property is to take it with an intent to deprive the owner of the rights and benefits of ownership.") (citing *U.S. v. Turley,* 352 U.S. 407, 411, 77 S.Ct. 397, 399, 1 L.Ed.2d 430 (1957)); *Murray v. State,* 214 Md. 383, 386, 135 A.2d 314, 315 (1957) ("Theft is defined as [a] crime consisting in the intentional taking, without legal warrant, of the personal property of another with the unlawful intention to deprive the owner of such property." (citation and quotations omitted)); *see also* Charles E. Moylan Jr., *Maryland's Consolidated Theft Law and Unauthorized Use* 61 (2002) (Theft requires "a more remote intent to achieve some purpose or bring about some end result above and beyond the mere intentional commission of the *actus reus....* It is required that the alleged thief ... has the purpose of depriving the

owner of property[.]").[5]

■ Intent may be inferred from acts occurring subsequent to the commission of the alleged crime. As we observed in *Sorrell v. State,*

> Flight by itself is not sufficient to establish the guilt of the defendant, but is merely a circumstance to be considered with other factors as tending to show a consciousness of guilt and therefore guilt itself.... The flight doctrine has been applied to **a broad spectrum of behavior occurring after the commission of a crime:** flight from the scene or from one's usual haunts after the crime, assuming a false name, shaving off a beard, resisting arrest, attempting to bribe arresting officers, forfeiture of bond by failure to appear, escapes or attempted escapes from confinement, and attempts of the accused to take his own life. (Emphasis added and citations omitted.)

315 Md. 224, 228, 554 A.2d 352, 353–54 (1989); *see also U.S. v. Latney,* 108 F.3d 1446, 1449–50 (D.C.Cir.1997) ("[L]ater acts are most likely to show the accused's intent when they are fairly recent and in some significant way connected with prior material events[.]" (citations omitted)); *Cash v. U.S.,* 700 A.2d 1208, 1212 (D.C.1997) ("Evidence of a subsequent act, if connected in some material way with the event in question, can be probative of a prior state of mind."); *Commonwealth v. Oliver,* 443 Mass. 1005, 820 N.E.2d 194 (2005) (holding that the appeals court properly considered "the defendant's subsequent conduct as probative of his intent at the time" of the act of theft); *State v. Hastings,* 137 N.H. 601, 631 A.2d 526, 529 (1993) ("[T]o be relevant to a defendant's earlier state of mind, subsequent acts must be fairly recent and in some significant way connected with prior material events.").

The State argues that Coleman's intent to deprive was proved by the fact that he entered into the contracts, and took the initial advances, with no intent to perform them fully.

---

5. Thus, irrespective of whether Coleman intended to deceive the buyers, a conviction for theft cannot stand without the intent to deprive.

Specifically, the State argues that the jury could have rationally concluded that Coleman never intended to perform based upon

his failure to put monies he received from advances toward development of the property; the lack of diligence with which he pursued the development process; and his misrepresentations and his lack of responsiveness to inquiries about the development's progress, both of which forestalled any legal action against him.

 We disagree. When a defendant has a right to receive money or property, he cannot be guilty of stealing it. *See* Md.Code § 7–101(j) of the Criminal Law Article (" 'Property of another' means property in which a person other than the offender has an interest that the offender does not have the authority to defeat or impair[.]"); *State v. King*, 95 Md. 125, 128, 51 A. 1102, 1103 (1902) ("[T]he Court must be able to determine judicially that the property alleged to have been stolen was the property of another and not the property of the accused[.]"); *see also State v. Galbreath*, 525 N.W.2d 424, 427 (Iowa 1994) ("[T]he term 'property of another' as it is used in [the theft statute] means property in which the owner retains an interest.... Thus, in the context of an ordinary construction contract, cash advanced as a down payment will not qualify as 'property of another' because title and possession are transferred from the owner to the contractor ... outright."); *Shelley v. State*, 447 So.2d 124, 125–26 (Miss.1984) (reversing a conviction for embezzlement even though the defendant received $13,250 under "a clearly written and executed contract" for home construction and failed to perform. The buyers "parted with their money and gave it completely to [the defendant]. When he received the money, it belonged to him [even though] he did not produce what is now claimed to have been the 'proceeds' under the quoted embezzlement statute."); *State v. Marshall*, 541 N.W.2d 330, 333 (Minn.Ct. App.1995) ("Because money paid by customers became the property of respondent ... the district court properly dismissed theft ... charges.").

■ Indeed, as we observed in *Sibert v. State*, even an honest belief in the right to receive money or property negates the mens rea element of theft:

In elaborating upon the claim of right defense, the Joint Subcommittee observed:

The claim of right defense springs from the notion that in cases of common law larceny **the defendant must have had an intent to permanently deprive the owner of the property. If the defendant acted under a mistake as to his right to deal with the property, he could not be guilty of larceny.** Similarly, if the defendant can produce evidence that he was acting under an honest belief he had a "claim of right", this will be weighed by the trier of the facts in resolving the issue of whether the defendant possessed the requisite *mens rea* to commit the offense of theft.

According to this legislative commentary, the claim of right defense in Maryland originated in *Saunders v. Mullinix*, 195 Md. 235, 72 A.2d 720 (1950). The Saunders Court, in referring to this defense in *dicta*, stated:

It is a generally accepted rule in criminal prosecutions that **one who either takes or retains the property of another without the latter's consent for a debt which he in good faith claims to be due him by the owner of the property is not guilty of larceny, because the existence of the debt or the *bona fide* belief in its existence shows a lack of felonious intent in the taking or detention of the property.**

(Emphasis added and citations omitted.)

301 Md. 141, 147–148, 482 A.2d 483, 486–87 (1984).

■ There is no evidence that Coleman lacked either a right to the money he received or "an honest belief" in that right. *See id.* The evidence at trial shows that he gave value, i.e. conveyed the lots, for the money he received in the way of advances to pay for the lots, as provided under the contracts. In exchange for the initial draws and miscellaneous payments,

the buyers received land and also construction blueprints. Coleman received no further payments or draws.

The State argues that Coleman took money not only for the land and blueprints, but also for his promise to build the homes. Thus, it argues, he stole the money that he took in exchange for the promise to build, because he never intended to complete construction. The State produced no evidence to support this, however, except to note that Coleman received more for the lot sales than he paid for the land. Importantly, there is no evidence that he received more than market value for the land he conveyed. Indeed, for at least seven of the eight lots, the price he charged was at or below the appraised value of the land.[6] In short, making a profit on a land transaction is not theft.

At trial, the State also attempted to introduce evidence that Coleman had used money from the initial draws for expenses unrelated to the contracts, but the trial judge did not allow the evidence. The State now argues that Coleman's failure to spend some of the money *implies* that he kept it for himself or used it for personal expenses. Specifically, the State asserts that Coleman "appear[ed] to develop the lots so that he could evade detection until he had spent the money" and "profited handsomely from selling [the] land." There is no evidence, however, that Coleman used the money for anything but the Kings Grant Court project. With these facts, no rational jury could conclude that Coleman intentionally deprived the buyers of their money by overcharging for their lots and keeping the excess money with no intent to perform the rest of the contracts.

What is more, Coleman's actions between the time of contract and the arrest manifested his intent to perform. In addition to deeding the lots for the money he received, Coleman worked with several companies to draft architectural drawings and floor plans; retained MDB to obtain permits

---

**6.** Coleman actually received $37,000 *less* for lot number seven than the price at which Glenn Newell, one of the non-testifying buyers, resold it on April 25, 2006.

and perform architectural and engineering services; hired two individuals to process permits; consulted a builder about the project; consulted with the CEO of Civtech about replacing MDB; and eventually replaced MDB with Civtech after MDB had missed its self-imposed deadline. These actions, continuing eight months after the contracts were signed, manifested Coleman's intent to perform. *Cf. People v. Riner,* 234 Ill. App.3d 733, 175 Ill.Dec. 850, 600 N.E.2d 1308, 1310 (1992) (holding that a conviction for theft should not stand when "the defendant's actions between the time of the contract and the arrest manifest an intention to perform the contract"); Md. Code § 7–104(f) of the Criminal Law Article ("Under this section, an offender's intention or knowledge that a promise would not be performed may not be established by or inferred solely from the fact that the promise was not performed.").

The cases on which the State relies do not support its sufficiency argument. The State relies primarily on *Fraidin v. State,* 85 Md.App. 231, 583 A.2d 1065 (1991), and *Lane v. State,* 60 Md.App. 412, 483 A.2d 369 (1984). . *Fraidin,* however, did not even address the intentional deprivation element of the theft statute. *See* 85 Md.App. at 245, 583 A.2d at 1072 ("Our concerns, therefore, in assessing legal sufficiency, are with only two sub-issues: 1) proof of deception and 2) proof of obtaining control.").

Lane, although it did address the deprivation element, did not involve the defendant's nonperformance of a contract. In *Lane,* the defendant was a real estate broker who had helped two home buyers procure mortgage loans. To ensure that the buyers would qualify for the loans, the defendant encouraged people unrelated to the transactions to "certify falsely . . . that they were co-purchasers and future residents of the [two] properties[.]" 60 Md.App. at 420–21, 483 A.2d at 374. Without these false certifications, the lender "would not have parted with its money." *Id.* at 421, 483 A.2d at 374.

In contrast to Coleman, the defendant in *Lane* never entered into the contracts at all. He simply facilitated the consummation of fraudulent mortgage contracts between oth-

er parties. Moreover, *Lane* held that the buyers' intent to perform was *irrelevant* because the theft was complete when the mortgages were fraudulently obtained. *Id.* at 423, 483 A.2d at 375. Because *Lane* did not connect the nonperformance of a contract with the intentional deprivation element of theft, it cannot support the State's position that Coleman intentionally deprived the buyers of their property by entering into contracts with no intent to perform.[7]

### The Deposits on New Homes Subtitle

The Deposits and New Homes Subtitle ("Act") in effect at the time of Coleman's execution of the contracts and receipt of the land acquisition advances required a builder or vendor to escrow money received from buyers when,

> in connection with the sale and purchase of a new single-family residential unit which is not completed at the time of contracting the sale, the vendor or builder obligates the purchaser to pay and the vendor or builder receives any sum of money before completion of the unit and grant of the realty to the purchaser[.]

Maryland Code (1998, 2010 Repl.Vol.), § 10–301(a) of the Real Property Article.

The Act required the escrow account to be maintained until one of these events occurred:

(1) The granting of a deed to the property on which the residential unit is located to the purchaser;

(2) The return of the sum of money to the purchaser; or

(3) The forfeiture of the sum by the purchaser, under the terms of the contract of sale relating to the purchase of the residential unit.

---

7. Furthermore, in *Lane* there was evidence that the defendant used the money he received for his own purposes. *See Lane v. State,* 60 Md.App. 412, 423, 483 A.2d 369, 375 (1984) ("Appellant appropriated a portion of the value when the money was used, at least partially, to fund his commissions and bonus."). Again, there is no evidence that Coleman kept the money or used it improperly.

Md.Code (1998, 2010 Repl.Vol.), § 10–301(b) of the Real Property Article.

"Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." *Adventist Health Care, Inc. v. Md. Health Care Comm'n,* 392 Md. 103, 124 n. 13, 896 A.2d 320, 333 n. 13 (2006). Section 10–301(a) obligated a builder or vendor to escrow only when he or she received money "in connection with the sale and purchase of a new single-family residential unit which is not completed . . . before completion of the unit." Md.Code (1998, 2010 Repl.Vol.), § 10–301(a) of the Real Property Article. If the legislature had intended the escrow requirement to apply to money received in exchange for land without a residential unit, it would not have referred to "the unit," "a new single-family residential unit," or a unit that is "not completed." Moreover, one of the events that terminates the escrow requirement—the "granting of a deed to the property on which *the residential unit is located* "—demonstrates that the legislature had in mind transactions in which the land had a residential unit on it.

The Legislature knew how to craft an escrow requirement that would cover transactions in which land is conveyed without a residential unit. For example, the Custom Home Protection Act provides that a builder must escrow money received "in advance of the completion of the labor or the receipt of the materials for which the consideration is paid." Md. Code (2009, 2010 Repl.Vol.), § 10–504(a)(1) of the Real Property Article. This escrow requirement, by its plain language, applies whether a residential unit is on the land or not. Such a requirement is sensible, in the case of construction advances, as a means to protect against builders who would abscond with advances before the home is completed.

No such danger existed under Coleman's contracts because he did not apply for or receive any draws or advances for construction. Instead, the contracts provided that construction costs would be financed through loan proceeds *already*

*held in escrow* by the lenders. To receive draws, Coleman would have needed to certify that materials were received or work was done, that payment was due, and that the Bank had inspected and approved the work or materials. It would not make sense for the legislature to have intended the Act to apply the escrow requirement to Coleman's situation, because he could not receive any advances with which he could abscond. Coleman's transactions stand in stark contrast to the kinds of transactions then covered by the escrow requirement, including advances for construction of unfinished homes under § 10–301(a) and advances for labor and materials under § 10–504(a)(1). Unscrupulous builders may steal advances, but they cannot steal what they never receive.

Our interpretation is confirmed by the original version of § 10–301, which required that the "escrow account ... be maintained until such time as the deed to *the new home is delivered* [.] " Chapter 667 of the Acts of 1969 (emphasis added). The first amendments to § 10–301, passed one year after the original version, confirm our interpretation as well. *See* Chapter 615 of the Acts of 1970 ("The escrow account ... shall be maintained ... until ... the conveyancing of a deed to the realty upon with *the residential unit is situated.*" (emphasis added)).

Indeed, the amendments passed in response to the Court of Special Appeals's decision in this case confirm that the prior version of § 10–301 did not apply. *See Md. Pennysaver Group, Inc. v. Comptroller of Treasury,* 323 Md. 697, 707–08, 594 A.2d 1142, 1147–48 (1991) (interpreting a 1957 statute based in part on subsequent amendments); *Comptroller of Treasury, Retail Sales Tax Div. v. Digi–Data Corp.,* 317 Md. 212, 231, 562 A.2d 1259, 1269 (1989) (same); *Hardisty v. Kay,* 268 Md. 202, 210–11, 299 A.2d 771, 775 (1973) (considering an amendment "passed subsequent to the trial" when interpreting the statute applied at trial).

Senate Bill 334 was passed in response to the Court of Special Appeals's opinion in *Coleman* "to establish that a builder must open an escrow account for deposits even if

construction on a new house has not yet begun[.]" *See* Senate Bill 334 2011, Fiscal and Policy Note.[8] The Bill revised § 10–301(a) so that the amended version requires a builder or vendor to establish an escrow account if,

> in connection with the sale and purchase of a new single-family residential unit ~~which,~~ **the construction of which has not begun or, if begun,** is not completed at the time of contracting the sale, the vendor or builder obligates the purchaser to pay and the vendor or builder receives any sum of money before completion of the unit and grant of the realty to the purchaser[.] (Changes highlighted.)

Chapter 450 of the Acts of 2011. It also amended § 10–301(b) so that the escrow account must be maintained until:

> (1) The granting of a deed to the property on which ~~the~~ **a completed** residential unit is located to the purchaser;
>
> (2) The return of the sum of money to the purchaser; or
>
> (3) The forfeiture of the sum by the purchaser, under the terms of the contract of sale relating to the purchase of the residential unit. (Changes highlighted.) [9]

---

**8.** Senate Bill 334 was co-filed with House Bill 379 2011.

**9.** Senate Bill 334 also adds two new sub-sections, §§ 10–301(b)(2) and 10–301(c), which provide,

> (2) The vendor or builder may make withdrawals from an escrow account established under subsection (a)(1) of this section that consists of sums received to finance the construction of a residential unit to pay, in accordance with a draw schedule agreed to by the purchaser in writing, documented claims of persons who have furnished labor or material for the construction of the residential unit.
> (c)(1)(i) In this subsection the following words have the meanings indicated.
> (ii) "Banking institution" has the meaning stated in § 1–101 of the Financial Institutions Article.
> (iii) "National banking association" has the meaning stated in § 1–101 of the Financial Institutions Article.
> (2) A banking institution or national banking association at which an escrow account established under subsection (a)(1) of this section is maintained is not responsible for a withdrawal from the escrow account made by the vendor or builder.

*Id.* These amendments do not disturb our interpretation of the 1998 version of the Act, under which Coleman was convicted.[10] Senate Bill 334 may have been intended to influence our interpretation of the 1998 version, as it purports to "clarif[y] the circumstances" under which a builder is required to escrow. *Id.* Nevertheless, "a statement by present members of a legislative body, as to what their predecessors intended in a statute enacted several years previously, is not entitled to much weight." [11] *Wash. Nat'l Arena Ltd. P'ship v. Treasurer, Prince George's County*, 287 Md. 38, 54 n. 7, 410 A.2d 1060, 1069 n. 7 (1980); *see also Collier v. Connolley*, 285 Md. 123, 126, 400 A.2d 1107, 1108 (1979) ("[W]e do not place much weight upon what the Legislature, in 1977, said was intended in a 1974 statute."); *Dir. of Fin. for Balt. County v. Myers*, 232 Md. 213, 218, 192 A.2d 278, 280 (1963) (holding that an "amendment . . . is not controlling as to the meaning of the prior law").

 The contrast between the amended Act and the superseded version demonstrates that the prior language did not mean what the new language does. *See Md. Pennysaver*, 323 Md. at 707–08, 594 A.2d 1142, 1147–48; *Hardisty*, 268 Md. at 210–11, 299 A.2d at 775. The former language, a "residential unit which is not completed," clearly denotes an unfinished unit, which did not exist on the land that Coleman conveyed. *See* Md.Code (1998, 2010 Repl.Vol.), § 10–301(a) of the Real Property Article. On the other hand, the modified language— "a residential unit, the construction of which has not begun"— refers to the mere promise of a home. *See* Chapter 450 of the Acts of 2011. Indeed, the amended Act retains the former

---

10. Nor are we asked to apply the revised Act retroactively.

11. Otherwise, "any retroactive legislation could be shielded from a successful constitutional attack merely by the insertion of such language." *Wash. Nat'l Arena Ltd. P'ship v. Treasurer, Prince George's County*, 287 Md. 38, 54, 410 A.2d 1060, 1069 (1980). Thus, "a recital that the Legislature in the past really intended what is now being enacted into law, cannot render a statute immune from constitutional challenge on retroactivity grounds." *Id.*

language alongside the new, which demonstrates that the former language must have a *different* meaning from the new. *See* Md.Code (2011), § 10–301(a) of the Real Property Article (referring to a "residential unit, the construction of which has not begun **or, if begun, is not completed**") (emphasis added); *Evans v. State*, 420 Md. 391, 400, 23 A.3d 223 (2011) ("We . . . read[ ] the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory."). It is clear, then, that Senate Bill 334 did not "clarify" the meaning of superseded § 10–301, but actually changed it. The superseded version, by its clear and unambiguous terms, does not apply to Coleman because it does not apply when a builder or vendor deeds land without a home on it.

## Conclusion

For the foregoing reasons, we affirm the Court of Special Appeals. There was insufficient evidence of intentional deprivation to support Coleman's theft convictions, and the clear and unambiguous language of the superseded Act indicates that it does not apply to transactions in which land is conveyed without a home.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**