*State of Maryland v. Christopher David Manion*, No. 48, September Term 2014, Opinion by Greene, J.

**CRIMINAL LAW – THEFT BY DECEPTION** – **CRIM. LAW ART. § 7-104(b)**

In reviewing the sufficiency of the evidence to sustain a criminal conviction for theft by deception under § 7-104(b) of the Criminal Law Article, this Court considers "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Taylor v. State*, 346 Md. 452, 457, 697 A.2d 462, 464 (1997) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). The defendant-contractor's misrepresentations as to his licensure status, coupled with his conduct subsequent to the initial deception, including his failure to perform despite being paid, the numerous excuses he provided to each homeowner following his failures, and his last minute attempts to refund homeowners of their money, sufficiently support an inference that defendant possessed an intent to deceive and to deprive each homeowner of their property at the time of entering into the home improvement contracts or obtaining their money or property, without the need to resort to any speculation.

Circuit Court for Charles County
Case No.  08-K-12-00638
Argued: February 5, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 48

September Term, 2014
_____

STATE OF MARYLAND,

v.

CHRISTOPHER DAVID MANION
_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.
_____

Opinion by Greene, J.
_____

Filed: April 1, 2015

Essentially, this case requires us to consider, as we did in *State v. Coleman*, 423 Md. 666, 33 A.3d 468 (2011), the circumstances under which the breach of a residential construction or remodeling contract rises to the level of criminal conduct. We must determine whether the evidence adduced at trial concerning Respondent, Christopher David Manion's ("Manion") intent was sufficient to sustain a conviction for theft by deception under Md. Code (2002, 2012 Repl. Vol., 2014 Supp.), § 7-104(b) of the Criminal Law Article ("Crim. Law").[1] In doing so, this Court recognizes the need to ensure the sufficiency of the evidence and emphasizes the deference to be accorded to the trier of fact in weighing that evidence.

## FACTUAL AND PROCEDURAL HISTORY

Following a bench trial in the Circuit Court for Charles County, Manion was convicted of five counts of theft by deception and two counts of conspiracy to commit theft by deception, and sentenced to a term of sixty-five years, thirty years suspended. Manion's convictions stem from various construction and remodeling contracts entered into between 2009 and 2011 with several homeowners.

---

[1] Crim. Law § 7-104(b) provides:

> (b) A person may not obtain control over property by willfully or knowingly using deception, if the person:
> (1) intends to deprive the owner of the property;
> (2) willfully or knowingly uses, conceals, or abandons the property in a manner that deprives the owner of the property; or
> (3) uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.

*Murphy Contract*

According to the testimony and other evidence presented at trial, Manion entered into a contract with Sue and Michael Murphy (the "Murphys") in August, 2009, to perform siding and window work on their home. Prior to being hired, Manion provided the Murphys with a piece of paper purportedly containing a home remodeler's license number.[2] Manion, however, had no such license. To be sure, the contract itself did not contain a license number.

After entering into the contract, the Murphys issued Manion's company, Comfort Construction, a check for $5,000 as an initial payment. Manion claimed shortly thereafter that the bank placed a ten-day hold on the check, and requested that the Murphys issue a second check for $5,000 in Manion's name personally.[3] Records produced at trial confirmed that Manion cashed both checks on the same day. Moreover, the Murphys testified that, according to bank records, no such hold existed.

Although work was set to begin in September, 2009, no work was performed and no materials were delivered. Manion offered several excuses, which the trial court discredited

---

[2] Pursuant to Md. Code (1992, 2010 Repl. Vol., 2014 Supp.), § 8-601(a) of the Business Regulation Article "a person may not act or offer to act as a contractor in the State unless the person has a contractor license." *See also* COMAR 09.08.01.04 ("A corporation or partnership may not act as a home improvement contractor unless it obtains a corporate or partnership home improvement contractor's license."). The statute provides that "[a] person who violates [the licensure requirement] is guilty of a misdemeanor[.]" Bus. Reg. § 8-601(d).

[3] The Murphys testified that they assumed the second check would be applied to the contract, rather than pay the remainder of the money owed upon completion of the project.

2

as unconvincing, for his failure to perform. Manion contacted the Murphys on the date that the materials were to arrive and claimed that the delivery truck driver was involved in a horrific automobile accident and had been killed. Manion later informed the Murphys that he needed to leave the country to attend a funeral for the delivery driver. Manion was not heard from again until sometime in 2010. After the Murphys' repeated attempts to contact Manion, he refunded the Murphys $1,300 of the $10,000 owed in late 2010. The Murphys made several attempts to obtain a full refund. Ultimately, communications stopped after Manion's phone was disconnected.

### *Lake Contract*

Sharon and Kenneth Lake (the "Lakes") hired Manion in September, 2011, to re-roof their home. The contract entered into between the Lakes and Manion stated that Manion was "licensed, bonded, & insured," each assertion being false. Despite having paid Manion a total of $3,400, no work was performed and no materials were delivered.

The delivery truck, containing the roofing materials Manion claimed would arrive, never showed. Over the next couple of weeks the Lakes attempted, on several occasions, to contact Manion concerning his failure to perform. Similar to the Murphys, the Lakes were given several excuses as to why Manion was unavailable, including that he was out-of-state or that a family member was sick and needed to be visited. Manion ultimately stopped returning the Lakes' calls. The week before trial, a representative of Manion came to the Lakes' house and offered them a refund of the money, which they accepted only after

3

providing their testimony at trial in this case.

### *James Contract*

Manion contacted Clovia and Walter James (the "Jameses"), having previously performed work on their home, looking for work in February, 2011. When the Jameses informed Manion that they had no need for construction work, but were in need of an electrician, Manion falsely claimed to be a licensed electrician as well. The Jameses ultimately contracted with Manion to replace an electrical box for $710. The following month, the Jameses also hired Manion to perform bathroom renovations. Manion's contracts stated that he was "licensed, bonded, & insured," which he was not. As part of the bathroom renovation project, the Jameses accompanied Manion on a trip to Lowe's Home Improvement Store in order to select materials that Manion claimed he would order, and paid Manion $1,094 for the materials in advance. The Jameses also split the cost of a dumpster to be used during the renovation and paid Manion an additional $350 to use the dumpster themselves.[4]

Despite having paid Manion, no work was started, much less completed, and no materials, or the dumpster, were delivered. The Jameses attempted repeatedly to contact Manion after Manion failed to perform. Manion provided the Jameses with numerous excuses for his failures. Manion, for instance, claimed to have ordered the wrong electrical box and that it needed to be reordered, that the dumpster could not be delivered because the

---

[4] The Jameses intended to use the dumpster to clear out their garage.

4

Jameses' driveway was blocked, that he was unavailable because he needed to pick up his daughter from school, and that his father passed away and he needed to attend the funeral. Manion sporadically contacted the Jameses about a refund and ultimately offered the Jameses a refund the weekend before his trial was to start.

### *Harsha Contract*

Geraldine Harsha ("Harsha") hired Manion in March, 2011, to perform siding and roofing work on her house for $6,071.92. In addition to Manion's oral representation that he was a licensed contractor, the contract with Harsha stated falsely that Manion was "licensed, bonded, & insured." Once again, Manion performed no work and failed to deliver any materials. When the work did not begin, Manion resorted to his usual excuses, including that a family member died and he needed to attend a funeral, or that he was unable to deliver materials because Harsha's driveway was blocked, despite being told that the cars could be moved. The week prior to trial, Harsha was offered a refund of her money for the first time.

### *Russell Contract*

Between September, 2009, and December, 2011, Pat and Frank Russell (the "Russells") hired Manion, along with Manion's partner Albert Styles ("Styles"), to perform an extensive list of renovations throughout their home. Indeed, the projects included, among other things: renovating the master bathroom, adding a cathedral ceiling in the master bedroom, installing hardwood flooring throughout several areas of the home, replacing fixtures and remodeling the kitchen, replacing windows and doors throughout the home,

remodeling the deck, installing a stone facade, paving the driveway, and extending the garage. Although Manion performed a significant amount of work, according to the testimony of Styles, nearly $150,000 of $350,000 paid by the Russells represents work and materials not performed or delivered.

Manion and Styles claimed to have a business, "D & M Construction," ("D & M") in whose name the contracts were made. The vast majority of the contracts stated that the business was "licensed, bonded, & insured." Despite representing themselves as owning D & M, the address listed for the business does not exist and there is no record that D & M has ever registered with the State Department of Assessments and Taxation ("SDAT"). Manion and Styles later contracted under the name "Built-Tight Construction," which was also unregistered and unlicensed. When the Russells asked Manion about his license status, he referred them to the contracts which stated "licensed, bonded, & insured."

At trial, Styles testified that he and Manion would request and cash the Russells' checks to buy materials immediately, even if the materials did not require payment at that time. Styles also testified that certain materials were never ordered, and that some checks were used to pay Styles's personal bills.

Although Manion was responsible for obtaining building permits necessary for construction, he failed to do so. Indeed, permits were not obtained until the Russells themselves acquired the permits roughly one year after certain projects had met their target completion deadline.

6

Towards the end of 2011, the Russells requested that Manion begin storing materials in their shed, to which only the Russells and Manion had a key. Manion informed the Russells that he placed tiles in the outbuilding for the bathroom renovations. When the Russells attempted to gain access to their outbuilding, their key did not work and they were forced to cut the lock. No tiles were found inside, however. During this time the Russells also rented a Personal On Demand Storage (PODS) unit through an agreement with Manion. Under this agreement, the Russells would pay rental fees for three months, after which time Manion and Styles would assume all storage costs. After roughly two and half months, the PODS unit, along with all of the Russells' personal belongings inside, had been removed. Manion informed the Russells that he discovered that the PODS Company had incorrectly retrieved the storage unit and that Manion would be able to recover the Russells' possessions that had been left inside for storage. Soon thereafter, Manion represented that he had recovered the Russells' possessions and was storing them at his own storage facility. The Russells did not recover any of the property that had been stored inside the PODS unit.

With respect to the driveway repaving work, Manion informed the Russells, having been unable to perform, that he would place all money relating to the project in escrow. Of the $9,600 he claimed to put in escrow, the State produced accounting records showing that Manion only deposited $1,800. Of the $1,800, Manion used $1,000 personally to obtain a lawyer in a matter unrelated to the Russells. Moreover, according to the testimony of several subcontractors, Manion failed to pay them for work performed. In addition, on several

7

occasions, Manion failed to hire the necessary subcontractors.

The Russells testified that they felt trapped in their situation with Manion and Styles, but made the decision to terminate Manion and Styles in late 2011. The Russells were given an extensive set of excuses for Manion's lack of performance throughout the two year period. Among the excuses, Manion's unfortunate predicament included: his grandmother breaking a hip; his father, a former alcoholic, falling off the wagon; his mother, who was bipolar, failing to take medication; that his grandmother in Canada died and he needed to attend the funeral; his mom and dad's basement flooding; and taking someone to the hospital for a spider bite. In addition, Manion claimed to have been involved in a car accident, which injured his foot and required a hospital visit. According to the Russells' testimony, however, the towing company Manion purported to use had no records of ever towing Manion's car. Manion also claimed that the steel beams that the Russells purchased to be used during construction for structural support could not be delivered because the steel supplier, Bay Metals, the business Manion's "metal guy" worked at, could not get up their driveway. According to the testimony of the owner of Bay Metals, the company has never worked with or taken any orders from Manion or Manion's purported businesses. Furthermore, Manion claimed, at one point, to have contracted the measles or chickenpox during an alleged outbreak in southern Maryland, and according to the testimony of the Russells, was told by

8

his doctors "that he needed to spend the week in bed."[5]  After receiving Manion's message, Mr. Russell "later called [Manion] and confronted him . . . at [a local bar,] his reaction was [] that he was angry with [Mr. Russell] and the only thing he wanted to know was who had told [Mr. Russell] [that he was at the bar]."  After this confrontation Manion requested a meeting with the Russells during which he indicated he was an alcoholic and needed time to become sober.  The Russells decided to terminate Manion after learning he was drinking at a local bar an hour after this meeting.[6]  As stated above, roughly $150,000 of the more than $350,000 paid by the time of termination represents work not performed and materials not delivered.

### *Procedural History*

Following a bench trial, Manion was convicted of five counts of theft by deception, in violation of § 7-104(b) of the Criminal Law Article, and two counts of conspiracy, and sentenced to sixty-five years of incarceration, with thirty years suspended.  In an unreported opinion, the Court of Special Appeals reversed, concluding that "there is insufficient evidence to support a reasonable inference that [Manion] had the specific intent to commit theft at the time he obtained monies."  On the State's request, we granted certiorari, *State v. Manion*, 439 Md. 327, 96 A.3d 143 (2014), to answer the following question, which we have

---

[5] The Russells were not sure whether Manion claimed to have the measles or chickenpox.

[6] Mr. Russell noted that these were "perhaps 50 to 20 percent" of the excuses Manion provided them during their relationship.

rephrased:[7]

> Did the Court of Special Appeals erroneously determine that the evidence adduced at trial concerning defendant's intent to deprive homeowners of their property was legally insufficient to sustain a conviction for theft by deception?

For the reasons explained below, we shall answer in the affirmative and reverse the judgment of the Court of Special Appeals. In doing so, we take care to distinguish the instant case, in which there is sufficient circumstantial evidence upon which the trier of fact could infer reasonably that Manion intended to deprive each homeowner of their property by deception, from cases in which jurors, through the want of direct or circumstantial evidence, are left to speculate entirely as to the accused's criminal intent at the time the criminal defendant obtained control over the homeowners' money or property.

## DISCUSSION

### *Standard of Review*

It is the responsibility of the appellate court, in assessing the sufficiency of the evidence to sustain a criminal conviction, to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Taylor v. State*, 346 Md. 452,

---

[7] As originally phrased, the petition raised the following question: "Where, consistent with *State v. Coleman*, 423 Md. 666 (2011), the trier of fact inferred an intent to deprive from acts subsequent to the defendant's deception, did the Court of Special Appeals run afoul of *State v. Mayers*, 417 Md. 449, 466 (2010), when it drew different inferences from the same conduct and reversed the conviction?"

10

457, 697 A.2d 462, 464 (1997) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979)). "[O]ur concern is only whether the verdict was supported by sufficient evidence, direct or circumstantial, which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *Taylor*, 346 Md. at 457, 697 A.2d at 465. Making this determination "does not require [the appellate] court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Dawson v. State*, 329 Md. 275, 281, 619 A.2d 111, 114 (1993) (citation omitted).

Indeed, "we are mindful of the respective roles of the [appellate] court and the [trier of fact]; it is the [trier of fact's] task, not the court's, to measure the weight of the evidence and to judge the credibility of witnesses." *Id.* The appellate court gives deference to "a trial judge's or a jury's ability to choose among differing inferences that might possibly be made from a factual situation[.]" *State v. Smith*, 374 Md. 527, 534, 823 A.2d 664, 668 (2003). "We do not second-guess the [trier of fact's] determination where there are competing rational inferences available." *Smith v. State*, 415 Md. 174, 183, 999 A.2d 986, 991 (2010). It is simply not the province of the appellate court to determine "whether the [trier of fact] could have drawn other inferences from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence." *Smith*, 415 Md. at 184, 999 A.2d at 991. Such deference is accorded, in part, because it is the trier of fact, and not the appellate court, that possesses a better opportunity to view the evidence presented first-hand,

11

including the demeanor-based evidence of the witnesses, which weighs on their credibility. *Walker v. State*, 432 Md. 587, 614, 69 A.3d 1066, 1082 (2013).

In other words, "when evaluating the sufficiency of the evidence in a non-jury trial, the judgment of the trial court will not be set aside on the evidence unless clearly erroneous[.]" *State v. Raines*, 326 Md. 582, 589, 606 A.2d 265, 268 (1992). We apply this standard "to all criminal cases, including those resting upon circumstantial evidence, since, generally, proof of guilt [beyond a reasonable doubt] based in whole or in part on circumstantial evidence is no different from proof of guilt based on direct eyewitness accounts." *Smith*, 374 Md. at 534, 823 A.2d at 668. In other words, similar to instances involving the presentation of direct evidence, where the determination of the accused's guilt is formed entirely upon the basis of circumstantial evidence, such evidence must permit the trier of fact to infer guilt beyond a reasonable doubt, and must not rest solely upon inferences amounting to "mere speculation or conjecture." *Smith*, 415 Md. at 185, 999 A.2d at 992.

### *Theft by Deception*

In the present case, this Court must determine whether the State produced sufficient evidence to support Manion's conviction for theft by deception under § 7-104(b) of the Criminal Law Article. As Judge Charles E. Moylan, Jr. writing for the Court of Special Appeals explained, this provision falls under the purview of the Consolidated Theft Statute, which "brought together under a single statutory umbrella a number of preexisting theft-related offenses [including larceny, embezzlement, false pretenses, shoplifting, and receiving

12

stolen property].” *Fraidin v. State*, 85 Md. App. 231, 243, 583 A.2d 1065, 1071 (1991).

“The purpose of the [Consolidated Theft Statute] [was] to avoid the subtle distinctions that existed and had to be alleged and proved to establish the separate crimes under the former law.” *Craddock v. State*, 64 Md. App. 269, 277, 494 A.2d 971, 975 (1985). *See also State v. Burroughs*, 333 Md. 614, 623, 636 A.2d 1009, 1014 (1994) (“A return to the era of arcane distinctions [between the separate crimes] that once existed is hardly an inviting prospect, and would seem to be inconsistent with the intent of the legislature expressed in the enactment of the consolidated theft statute.”).

Under § 7-104(b) of the Criminal Law Article, theft by deception, which served to replace the preexisting crime of false pretenses, *see Fraidin*, 85 Md. App. at 243-44, 583 A.2d at 1071-72:

> A person may not obtain[8] control over property by willfully or knowingly using deception[9], if the person:

---

[8] Property is obtained under the statute where the offender “bring[s] about a transfer of interest in or possession of the property[.]” Crim. Law § 7-101(g). “Property can be ‘obtained’ for purposes of theft by deception, even when it is transferred to a third party.” *Coleman*, 423 Md. at 673, 33 A.3d at 472. *See also Fraidin*, 85 Md. App. at 254-55, 583 A.2d at 1077 (same).

[9] Crim. Law § 7-101(b) provides, in relevant part:

> “Deception” means knowingly to: (i) create or confirm in another a false impression that the offender does not believe to be true; (ii) fail to correct a false impression that the offender previously has created or confirmed; . . . (vii) promise performance that the offender does not intend to perform or knows will not be performed[.]

(continued...)

13

(1) intends to deprive the owner of the property;

(2) willfully or knowingly uses, conceals, or abandons the property in a manner that deprives the owner of the property; or

(3) uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.

The offender deprives another of their property, under the statute, where the property is withheld:

(1) permanently;

(2) for a period that results in the appropriation of a part of the property's value;

(3) with the purpose to restore it only on payment of a reward or other compensation; or

(4) to dispose of the property or use or deal with the property in a manner that makes it unlikely that the owner will recover it.

Crim. Law § 7-101(c).

As explained previously by this Court in *State v. Coleman*, 423 Md. 666, 33 A.3d 468 (2011), theft by deception is a specific intent crime requiring both an intent to deceive and an intent to deprive. 423 Md. at 673, 33 A.3d at 472 ("The requirement of intentional deprivation makes theft a specific intent crime."). *See also Mitchell v. State*, 363 Md. 130,

---

[9](...continued)
We note that, unlike the crime of false pretenses, theft by deception does not require that an individual actually rely upon the misrepresentation. *Fraidin*, 85 Md. App. at 259, 583 A.2d at 1079 ("Detrimental reliance by the victim is not [] a necessary element of criminal theft based upon deception.").

146, 767 A.2d 844, 853 (2001) (explaining that "conspiracy is necessarily a specific intent crime; there must exist the specific intent to join with another person in the accomplishment of an unlawful purpose or lawful purpose by unlawful means").  Given the subjective nature of intent, the trier of fact may consider the facts and circumstances of the particular case when making an inference as to the defendant's intent.  *Titus v. State*, 423 Md. 548, 564, 32 A.3d 44, 54 (2011) (explaining that "the trier of fact can infer from a defendant's actions and the surrounding circumstances whether the defendant had the requisite intent"); *Bible v. State*, 411 Md. 138, 157, 982 A.2d 348, 359 (2009) ("Because 'intent is subjective and, without the cooperation of the accused, cannot be directly and objectively proven, its presence must be shown by established facts which permit a proper inference of its existence.'") (quoting *State v. Smith*, 374 Md. 527, 536, 823 A.2d 664, 669 (2003)); *State v. Raines*, 326 Md. 582, 591, 606 A.2d 265, 269 (1992) ("[I]ntent must be determined by a consideration of the accused's acts, conduct and words.").

The defendant's intent to deprive, "may be inferred from acts occurring subsequent to the commission of the alleged crime." *Coleman*, 423 Md. at 674, 33 A.3d at 472. *See also U.S. v. Latney*, 108 F.3d 1446, 1449-50 (D.C. Cir. 1997) ("[L]ater acts are most likely to show the accused's intent when 'they are fairly recent and in some significant way connected with prior material events[.]'") (citation omitted).  Where the defendant is charged with theft by deception, the statute makes clear, however, that "an offender's intention or knowledge that a promise would not be performed may not be established by or inferred **solely** from the

15

fact that the promise was not performed." Crim. Law § 7-104(f) (emphasis added). To be sure, this is not to suggest that a conviction for theft by deception may never be based, in part, upon the defendant's failure to perform, so long as other evidence sufficient to permit the trier of fact to ascertain the defendant's intent exists.

An intent to deprive does not lie where the defendant has a right to the property. Crim. Law § 7-101(j) (defining "property of another" as "property in which a person other than the offender has an interest that the offender does not have the authority to defeat or impair, even though the offender also may have an interest in the property"). *Coleman*, 423 Md. at 675, 33 A.3d at 473. Moreover, a defendant's intent to commit theft may be negated by an honest belief in the right to the property. As explained by this Court in *Coleman*:

> The claim of right defense springs from the notion that in cases of common law larceny **the defendant must have had an intent to permanently deprive the owner of the property. If the defendant acted under a mistake as to his right to deal with the property, he could not be guilty of larceny.** Similarly, if the defendant can produce evidence that he was acting under an honest belief he had a "claim of right[,]" this will be weighed by the trier of the facts in resolving the issue of whether the defendant possessed the requisite *mens rea* to commit the offense of theft.

423 Md. at 676, 33 A.3d at 473 (emphasis in original) (quoting *Sibert v. State*, 301 Md. 141, 147, 482 A.2d 483, 486 (1984)).

The State requests that this Court reverse the judgment of the intermediate appellate court and conclude that the evidence adduced at trial concerning Manion's intent was sufficient to sustain his conviction for theft by deception. Apart from Manion's failure to perform, or complete, the various construction projects, the State notes:

16

[Manion] lied about his licensure with the State of Maryland; he gave various false excuses[10] as to why he could not perform; he contracted using companies not registered with the SDAT; and he insisted on being paid either in cash or checks written to him personally which, in the case of the Murphys he cashed immediately; and he refunded the Lakes, Jameses, and Geraldine Harsha, only on the eve of his trial at which he expected each to testify against him.

The State avers that, when taken together, the evidence was sufficient to establish, beyond a reasonable doubt, that Manion was guilty of theft by deception. This evidence, the State asserts, goes beyond mere non-performance, and instead exhibits an intent to deprive. Accordingly, the State contends that the determination of the trial court was not "clearly erroneous" and that the Court of Special Appeals therefore erred by "improperly stepp[ing] into the role of a fact finder" and reversing the conviction.

Manion urges this Court to uphold the decision of the Court of Special Appeals, and argues that the evidence was insufficient to establish that he intended to deprive each homeowner of their money. Manion notes that the State continues to focus solely on his intent to deceive, but has not produced sufficient evidence establishing that he "intentionally deprived" each homeowner of their money. While Manion does not seriously dispute that

---

[10] It was the State's theory, which the trier of fact apparently accepted, that Manion's numerous excuses were fictitious or suspicious. The State cast doubt upon these excuses, in closing, by describing the exhaustive list of statements made by Manion to the homeowners, and stating facetiously that "one wonders whether or not [Manion] is the most unlucky person on the face of the Earth." The evidence in the record contradicted Manion's excuses on several occasions as outlined above. When coupled with the other false statements made by Manion, the State cast serious doubt upon the validity of these excuses. After hearing the evidence presented, the trial court found these representations to amount to "lies and excuses."

he "may have lied to a homeowner about his licensing status to *obtain* a contract[,] . . . [he maintains that this] does not bear on whether he possessed a criminal intent to permanently deprive the homeowner of property by *never intending to perform* on the contract." (Emphasis in original). Manion further contends that his non-performance is insufficient to establish an intent to deprive. Moreover, Manion asserts that the "excuses" are "plainly insufficient" to establish that he intended to deprive the homeowners of their money at the time of the alleged deception. Finally, Manion argues that "it would [] be a remarkable proposition of law that refunding a customer's money could be used to establish one's intent to permanently deprive the customer of that money[.]" With respect to the Russell contract, in particular, Manion notes that a substantial amount of work was completed and that Styles, Manion's partner, testified that he and Manion, among other things, never intended to steal from their customers. The evidence, Manion asserts, simply "failed to establish *beyond a reasonable doubt* that Mr. Manion entered into his contract with the Russells with the *purpose* of depriving them of their property–with *no intent to ever perform*." (Emphasis in original).

In our view, the State presented sufficient evidence upon which a reasonable trier of fact could conclude that Manion intended to deceive each homeowner when he falsely represented his status as a licensed contractor. Indeed, Manion does not contest that he misrepresented his licensure status to each homeowner. As explained above, Manion (1) provided the Murphys with a sheet of paper purporting to contain a license number, (2)

18

stated that he was "licensed, bonded, & insured" on contracts with the Lakes, the Jameses, Harsha, and the Russells, and (3) in addition to representing himself as a licensed contractor, informed the Jameses he was a licensed electrician. These representations were plainly false. Moreover, Manion made no effort to correct the false impressions he created.

From the circumstantial evidence presented regarding Manion's intent, a rational trier of fact could conclude, beyond a reasonable doubt, that Manion intended to deprive each homeowner of their money. This conclusion could be drawn without the need to resort to conjecture or speculation. With respect to the contracts Manion entered into with the Murphys, the Lakes, the Jameses, and Harsha, the State presented evidence that Manion failed to begin, much less complete, the projects he contracted to perform or deliver construction materials, despite having been paid. Indeed, the Murphys issued Manion a check for $5,000 in the name of Manion's reputed business, and a second check for $5,000 in Manion's name personally after being told by Manion that the bank had placed a hold on the first check. Evidence presented showed that both checks where cashed by Manion on the same day. Similarly, Manion was paid $3,400 by the Lakes, over $2,000 by the Jameses, and over $6,000 by Harsha, for work never started and materials never delivered. Manion's conduct exceeded that of mere non-performance. After failing to perform, Manion provided each of the homeowners with numerous representations which the trial court, after considering the evidence before it and weighing the credibility of the witnesses, found to be false or incredulous, including the assertion that Manion needed to leave the country for a

19

funeral, that he was unable to deliver materials because his delivery driver was involved in a fatal accident, that the homeowners' driveways were blocked, or that Manion's car needed to be towed following an accident, despite the fact that the towing company had no records of ever towing Manion's vehicle. After failing to perform, the homeowners made several attempts to obtain a refund, and ultimately stopped hearing from Manion. It was not until the week prior to trial that Manion offered the Lakes, the Jameses, and Harsha a refund, or in the case of the Murphys a partial refund of less than 15% of the total money owed approximately a year after Manion failed to begin construction.

As for the contracts between Manion and the Russells, the evidence adduced at trial included that nearly $150,000 was paid for services and materials not performed or received. According to Styles's own testimony, he used money from the Russells to pay personal bills rather than order construction materials. During the two-year relationship, Manion failed to obtain permits, pay or obtain certain subcontractors, and offered numerous excuses for his failures to perform, including the fact that he needed to take someone to the hospital for a spider bite or that he caught measles during an outbreak in Southern Maryland. We also note that Manion informed the Russells he would deposit $9,600 paid in relation to the driveway work Manion was to perform into an escrow account after failing to begin the project, but, based upon bank records produced, only deposited $1,800. In addition, of the $1,800 deposited, Manion used $1,000 personally to obtain an attorney in an entirely unrelated matter. The Russells also testified that a PODS unit, to be shared with Manion, disappeared

20

from their driveway, along with the personal materials inside, and was never recovered despite Manion's representations that he had recovered the materials inside and was storing them at his own facility. Moreover, the Russells encountered issues relating to a shed they requested Manion use to store materials in relation to one of the renovation projects. The lock, to which only the Russells and Manion had the key, was changed, presumably by Manion, and, after breaking the new lock, no materials were found inside. The circumstances following Manion's failure to perform, when viewed collectively in the context of this case, support a reasonable inference that Manion entered into the construction contracts with the intent to deprive each of the homeowners of their property. After considering the testimony and other evidence before it, the trial court could have reasonably inferred that Manion intended to deprive his customers of their money.

We had occasion to confront this issue in *State v. Coleman*, 423 Md. 666, 33 A.3d 468 (2011). In *Coleman*, this Court considered whether the evidence adduced at trial was sufficient to sustain a conviction for theft by deception where the defendant-contractor failed to perform several construction contracts. Beginning in February, 2004, Coleman entered into several contracts to purchase and convey eight lots of a subdivision, and ultimately construct new homes for each buyer. 423 Md. at 670, 33 A.3d at 470. The buyers agreed to purchase the unimproved lots by obtaining loans with an initial advance. 423 Md. at 671, 33 A.3d at 470. Coleman purchased the lots using the advances and conveyed title to each buyer by deed at closing. *Id.* The remaining balance of each buyer's loan was held in escrow by

the lenders and was to be drawn by Coleman during construction to cover his costs. 423 Md. at 671, 33 A.3d at 471. Coleman withdrew no money from the escrow accounts as construction was never started, much less completed. *Id.* Coleman failed to begin construction due to financial difficulties he encountered prior to obtaining the required construction permits, as well as delays in the permitting process caused by a subcontractor's repeated failure to meet deadlines. 423 Md. at 671-72, 33 A.3d at 471.

Coleman, similar to Manion in the instant case, was arrested and convicted of theft by deception under § 7-104(b) of the Criminal Law Article. On appeal, this Court affirmed the judgment of the intermediate appellate court reversing Coleman's convictions, and explained that the evidence was insufficient to establish that Coleman intended to deprive the buyers of their money. 423 Md. at 669, 675-77, 33 A.3d at 469, 473-74. We explained that the State failed to produce any evidence that Coleman lacked either a right, or a bona fide belief in a right, to the buyers' money. 423 Md. at 676, 33 A.3d at 474. To the contrary, the evidence produced showed that Coleman provided the buyers with title to the unimproved lots in exchange for their initial advances, which in nearly all contracts was at or below the market price. 423 Md. at 677, 33 A.3d at 474. Apart from the initial advances, Coleman received no additional money. *Id.* We rejected the State's argument that "Coleman [also] took money . . . for his promise to build the homes," such that his failure to perform demonstrated an intent to deprive the buyers of their money. *Id.* The State's argument rested solely upon the fact that Coleman apparently received more money for the lots than he paid;

we reiterated, however, that Coleman received no more than the appraised value of the land. *Id.* We went on to point out that no evidence was produced that Coleman used the money improperly and that Coleman's actions occurring subsequent to entering into the contracts evinced an intent to perform, including drafting blueprints, hiring contractors, and making efforts to obtain permits through a subcontractor. 423 Md. at 677-78, 33 A.3d at 474.

Manion contends that the State's position in the present case is inconsistent with our decision in *Coleman*. We disagree that the instant case contradicts the result reached in *Coleman* and note that the evidence adduced at trial regarding Manion's intent far exceeded his non-performance. Although both Manion and Coleman failed to complete construction contracts, the similarity between the two ends there. Whereas Coleman provided buyers with title to land in exchange for an initial payment and requested no additional money for construction, Manion provided no services or materials in exchange for money he received. Moreover, Coleman's conduct subsequent to entering into the contracts lies in stark contrast to that of Manion's. Coleman performed significant work in preparation for the construction project, including:

> [W]ork[ing] with several companies to draft architectural drawings and floor plans; retain[ing] MDB to obtain permits and perform architectural and engineering services; hir[ing] two individuals to process permits; consult[ing] a builder about the project; consult[ing] with the CEO of Civtech about replacing MDB; and eventually replac[ing] MDB with Civtech after MDB missed its self-imposed deadlines.

*Coleman*, 423 Md. at 677-78, 33 A.3d at 474. With respect to the projects Manion failed to perform, however, there was no evidence of any similar efforts.

23

To the contrary, the State presented evidence that Manion offered a plethora of either incredulous or outright false excuses after failing to perform. For instance, Manion informed the Russells that he needed to visit the hospital following a car accident which required his car to be towed. The Russells testified, however, that the towing company Manion claimed to have used had no records or knowledge of the accident. Moreover, Manion provided the same excuses to several homeowners which casts into doubt their viability, including the fact that materials were undeliverable because driveways were blocked in the case of Harsha–even though Harsha's son informed Manion that the cars could be moved–and the Jameses. Similarly, Manion claimed that a delivery truck carrying structural steel beams to the Russells, for which they had paid Manion directly, could not traverse the Russells' driveway. The company Manion allegedly used had no records of his supposed order and was unfamiliar with Manion or his reputed businesses. We also note that Manion at one point claimed to be severely ill with the measles or the chickenpox and that his doctor ordered that he recuperate in bed for a week or two, but was seen by Mr. Russell at a local bar shortly thereafter. Although Manion did perform a significant amount of work for the Russells, he also failed to perform numerous projects, amounting to approximately $150,000 in services not rendered and materials not delivered, and, among other things, requested and obtained money for materials even where up-front payment was not required. He, among other things, failed to obtain permits, used money to pay for an attorney in an unrelated matter, and provided the Russells with an extensive list of questionable excuses, which the

24

trial court noted were "too numerous to name."

In addition to the excuses upon which the State cast doubt through the presentation of testimony, Manion made outright lies to the homeowners, in addition to falsely claiming to be a licensed contractor. For instance, Manion informed the Russells he would deposit $9,600 of the money paid into escrow, when bank records show he deposited only $1,800 and used $1,000 of this money personally to fund his legal defense in a separate matter. Moreover, Styles, Manion's business partner, testified that money was used to pay personal bills instead of being spent on materials Manion claimed to have ordered. We hardly consider Manion's efforts to complete projects for the Russells to parallel the efforts of the defendant in *Coleman*. In *Coleman* there was simply no evidence bearing on the defendant's intent apart from the fact that he failed to perform and that he received more money for the unimproved lots than he actually paid. *Coleman*, 423 Md. at 676-77, 33 A.3d at 474. This is not the case here; as discussed *supra*, the State produced sufficient evidence to allow the trier of fact to conclude, beyond a reasonable doubt, that Manion possessed the requisite intent to deprive the homeowners of their property.

Apart from Manion's misguided reliance on *Coleman*, Manion offers several other arguments in support of his position, which we address in turn. Manion contends that "none of [the] evidence demonstrates beyond a reasonable doubt that Mr. Manion harbored an intent to deprive at the time of contracting" by pointing out how the evidence, when viewed in isolation, is insufficient. Although Manion may be correct that in *another* case the mere

25

fact of non-performance, or the presence of improbable excuses, or a defendant's last-minute refunding of money may be insufficient to establish the defendant's criminal intent when viewed in isolation, that is not the case here. When viewed together, the circumstances sufficiently support the determination of the trial court and we do not find its conclusion to be clearly erroneous.

Manion, for instance, cites to our opinion in *Bible v. State*, 411 Md. 138, 982 A.2d 348 (2009), for the proposition that lies–or in Manion's case, excuses, which the trial court discounted as suspicious or fallacious–told subsequent to the alleged wrongful act are insufficient to establish intent. In *Bible*, this Court addressed whether the evidence adduced at trial was sufficient to establish that the defendant intentionally touched the intimate area of the victim "for the purpose of sexual gratification." 411 Md. at 158, 982 A.2d at 359. To be sure, we explained that the fact that Bible initially lied to police officers about being at the location of the alleged touching did not establish his mental state.[11] We explained, with respect to Bible's statements to police, that "there are many [] reasons Bible could have lied to the police about his actions, including a fear that he would be charged with shoplifting or some other crime. Many people fear involvement with the police." *Bible*, 411 Md. at 160,

---

[11] Specifically, after the police traced Bible's license plate to his address in response to a complaint received by the victim's mother, Bible, during an interview at his apartment with the police, "'denied that he was there. He wasn't for sure [sic] if he was there or not. And then as [he] kept talking, he did say he was there' looking at VCRs." *Bible*, 411 Md. at 144, 982 A.2d at 351. Bible also claimed that he did not recall seeing any children in the store. *Id.*

26

982 A.2d at 361. Our conclusion, however, was based upon the fact that the *only* evidence presented to support an inference concerning the defendant's intent was that the victim, a minor, stated that defendant "touched her for 'like two seconds' twice and [that] she expressed to her mother that [defendant] was a 'pervert.' Beyond that, neither [this Court] nor the jury kn[e]w anything else about the circumstances of the incident." *Bible*, 411 Md. at 159, 982 A.2d at 360. The fact that the misstatement by Bible failed to establish the defendant's mental state in no way compels us to conclude that the numerous excuses offered by Manion, in the context of the instant case, fail to support, in any way, a reasonable inference of his intent. Moreover, Manion appears to ignore that his intent was not inferred solely from the fact that he provided numerous excuses to the homeowners, which were cast into doubt by the testimony presented. The trial court, after viewing the entirety of the evidence and weighing the credibility of the witnesses, could have reasonably determined that Manion's "lies" and excuses, which the court characterized as "too numerous to name," supported, in part, a reasonable inference of his criminal intent.[12]

---

[12] We do not suggest that a contractor may not offer valid excuses for his or her non-performance in another case. Indeed, a contractor may run into issues subsequent to entering into a contract with a homeowner which prevents his or her timely performance. *See, e.g., Coleman*, 423 Md. at 671-72, 33 A.3d at 471. That is not this case, however. In the instant case, the trial court concluded that this was not "a situation where the economy tanked and [Manion] was a victim of that." Manion provided the homeowners with various excuses for his failure to perform. The evidence presented at trial contradicted Manion's statements and cast doubt upon his excuses on many occasions. From the evidence adduced at trial, the trier of fact could have reasonably concluded that Manion's excuses were, in many instances, fabricated.

27

With regard to the contracts with the Russells, Manion points out that (1) a substantial amount of work was performed on their home and that (2) Styles testified that neither he nor Manion intended to steal from the Russells. The fact that Manion performed some of the many projects he contracted with the Russells to complete or that Styles, Manion's partner who, we note, also testified to using money to pay personal debts rather than order materials, testified that he never intended to deprive the homeowners of their money does not unequivocally establish that Manion lacked an intent to deprive. Although the trier of fact may have given this evidence more or less weight, this is not our concern on appeal. As explained above, it is not the role of the appellate court to re-weigh the evidence and to re-evaluate the credibility of witnesses. *Dawson v. State*, 329 Md. 275, 281, 619 A.2d 111, 114 (1993). It is not our role, in assessing the sufficiency of the evidence, to determine "whether the [trier of fact] could have drawn other inferences[,] . . . refused to draw inferences, or whether we would have drawn different inferences from the evidence." *Smith*, 415 Md. at 184, 999 A.2d at 991. "[O]ur concern is only whether the verdict was supported by sufficient evidence, direct or circumstantial, which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *Taylor v. State*, 346 Md. 452, 457, 697 A.2d 462, 465 (1997).

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE**

**CIRCUIT COURT FOR CHARLES COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**